836 A.2d 5

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**April Georgette SMITH, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 15, 2001.

Decided Nov. 19, 2003.

204

Thomas Sundmaker, Jeffrey G. Valander, Stroudsburg, for April Georgette Smith, appellant.

Bruce Lee Castor, Timothy Woodward, Michael Marino, Mary MacNeil Killinger, Patricia Eileen Coonahan, Norristown, for the Com. of PA, appellee.

Ronald T. Williamson, William H. Ryan, Harrisburg, Robert A. Graci, Pittsburgh, D. Michael Fisher, Harrisburg, for Atty. Gen. of PA.

Before: ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

Justice CASTILLE.

This case presents both state and federal search and seizure issues arising from a drug interdiction operation at a commercial bus station terminal. We affirm the order of the Superior Court below.

On November 22, 1996, Agent Ronald Paret of the Pennsylvania Attorney General's Office and Trooper David Hodges of the Pennsylvania State Police performed a drug interdiction investigation at the King of Prussia bus terminal in the Valley Forge Shopping Center in Montgomery County. At approximately 11:20 a.m., a Greyhound bus en route from New York to Pittsburgh made a scheduled stop at the terminal. Agent

Paret and Trooper Hodges approached the driver of the bus, identified themselves officially, and requested to examine the bus tickets of the passengers. After first allowing passengers to board or to exit the bus, Agent Paret and Trooper Hodges boarded the bus.

Once inside the bus, Trooper Hodges identified himself as a police officer and explained to the passengers the purpose of the interdiction. Agent Paret and Trooper Hodges were dressed in plain clothes, but wore jackets which clearly identified them as police officers. The officers proceeded to the rear of the bus and, while Agent Paret examined the restroom for illegal drugs, Trooper Hodges began to question the passengers. The officers physically situated themselves so that the aisle remained clear for passenger movement and the bus door was open at all times. Testimony established generally that, while performing a drug interdiction, the officers would abide by the schedule of the bus; thus, once the driver indicated that it was the scheduled time to depart, the officers would conclude their investigation and leave the bus. Additionally, in order to place the passengers at ease, Agent Paret and Trooper Hodges spoke in a normal tone of voice and, if any passenger indicated an unwillingness to cooperate, the officers would simply move on to the next passenger.

The officers eventually made their way to the front row of the bus, where appellant was seated. Because she was in the front row, appellant was the last person Trooper Hodges approached. While talking with appellant, Trooper Hodges stood in the stairwell of the bus and Agent Paret stood behind appellant, leaving the aisle clear and the bus door open and accessible. Trooper Hodges asked appellant to see her ticket and identification, examined them and returned them to her. He then inquired about her trip, and appellant responded that she was going to Pittsburgh for five days. Since Trooper Hodges had noticed that appellant did not have a luggage claim ticket stapled to her bus ticket, he inquired about her possession of any luggage. Appellant responded that she had no luggage with her. Trooper Hodges observed a black bag on the floor of the bus between appellant's right foot and the

side of the bus and asked appellant if the bag belonged to her. Appellant looked away and said that the bag did not belong to her. Trooper Hodges then asked the passenger sitting on appellant's left-hand side if the bag was hers. That passenger also denied ownership. Trooper Hodges then held the bag up in the front of the bus and asked the other passengers if the bag belonged to any of them. After receiving no response, the officer asked again, but no one claimed the bag.

Trooper Hodges placed the bag on the stairwell of the bus, out of sight of appellant and the other passengers, and examined it for identifying information. Trooper Hodges found a shirt and plastic bags containing zip-lock bags which appeared to contain drugs. (Subsequent testing revealed that the plastic bags contained 496 grams of crack cocaine.) Trooper Hodges testified that, at this time, he did not believe that he had probable cause to arrest appellant, albeit he believed that the bag was hers. Trooper Hodges then asked appellant to speak with him outside the bus. In making this request, the trooper did not physically touch appellant or make any show of force other than that previously described. Appellant followed Trooper Hodges from the bus. Agent Paret remained on the bus to question the other passengers who were sitting next to and behind appellant about the bag. Outside the bus, Trooper Hodges again asked appellant if the bag was hers. Appellant again denied owning the bag. Trooper Hodges advised appellant that the police would eventually be able to identify the owner of the bag through fingerprint and hair samples. Appellant stood silent for a moment and responded that the bag was hers, but that the drugs were not, and that she was transporting them for someone else.

After appellant made this statement, Trooper Hodges led her into the bus station, informed her of her *Miranda*[1] rights and arrested her for transporting illegal drugs. Appellant waived her *Miranda* rights and admitted to Trooper Hodges that she was transporting the drugs for a friend in exchange for four hundred dollars, which she needed to buy her son

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

shoes. Incident to appellant's arrest, Trooper Hodges searched her handbag and seized two small packs of marijuana.

On February 19, 1997, appellant filed an omnibus pre-trial motion seeking to suppress the physical evidence seized from the black bag and her handbag, as well as the incriminating statements she made. After a hearing, the motion was denied. Appellant then proceeded to a bench trial, at which the testimony from the suppression hearing was incorporated. Appellant was convicted of possession and possession with intent to deliver a controlled substance (cocaine)[2] and possession of marijuana.[3] On December 5, 1997, appellant was sentenced to an aggregate term of four to eight years' imprisonment.[4] Appellant appealed to the Superior Court.

On appeal, a divided Superior Court panel affirmed in a published opinion. *Commonwealth v. Smith*, 732 A.2d 1226 (Pa.Super.1999). With respect to the suppression claims, the panel majority concluded that the initial questioning on the bus was a mere encounter, relying upon the reasoning of *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), and not a seizure.[5] The panel majority also concluded that appellant voluntarily abandoned the black bag containing the cocaine. Finally, the Superior Court concluded that the statements appellant made prior to the issuance of *Miranda* warnings were admissible because she was not in custody at the time. Then–President Judge McEwen dissented without opinion.

■■■■■■ Appellant now alleges, as she did below, that the suppression court erred in denying her motion to suppress the

---

**2.** 35 P.S. §§ 780–113(a)(16), (a)(30).

**3.** *Id.* § 780–113(a)(31).

**4.** The four year term was the mandatory minimum sentence required, given the amount of cocaine appellant possessed with the intent to deliver. *See* 18 Pa.C.S. § 7508.

**5.** The Superior Court noted that, although appellant invoked both the federal and state constitutions, she "fail[ed] to differentiate or distinguish in any way the [respective] protections." *Smith*, 732 A.2d at 1234 n. 6. The Superior Court therefore conducted a unitary analysis and concluded that neither constitution was violated.

drugs and her statements. In addressing a challenge to the denial of a suppression motion, this Court's review is limited to "the evidence for the prosecution and whatever evidence for the defense which is uncontradicted on the record as a whole." *Commonwealth v. Ellis,* 541 Pa. 285, 662 A.2d 1043, 1049 (1995) (quoting *Commonwealth v. O'Shea,* 523 Pa. 384, 567 A.2d 1023, 1028 (1989)). Additionally, we are bound by the facts found by the suppression court which are supported by the record. We may reverse the suppression court only if the legal conclusions drawn from the supported facts are erroneous. *See id.; see also Commonwealth v. Zhahir,* 561 Pa. 545, 751 A.2d 1153, 1156 n. 1 (2000). Since the operative facts here are not in dispute,[6] our review is of the legal conclusions below; review of such questions of law is plenary.

In forwarding her claim on appeal, appellant cites interchangeably to the Fourth Amendment and to Article I, Section 8 of the Pennsylvania Constitution, and cites to cases sounding under both charters.[7] A primary purpose of both the Fourth Amendment and Article I, Section 8 "is to protect citizens from unreasonable searches and seizures." *In the Interest of D.M.,* 566 Pa. 445, 781 A.2d 1161, 1163 (2001). Not every encounter between citizens and the police is so intrusive as to amount to a "seizure" triggering constitutional concerns. *See Commonwealth v. Boswell,* 554 Pa. 275, 721 A.2d 336, 340 (1998) (opinion in support of affirmance) (citing *Terry v. Ohio,* 392 U.S. 1, 20 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). This Court has noted that there are three basic categories of interactions between citizens and the police. The first category, a mere encounter or request for information, does not need to be supported by any level of suspicion, and does not carry any official compulsion to stop or respond. The second category, an investigative detention, derives from *Terry v. Ohio*

6. The only witnesses to testify regarding the interdiction were the two officers; appellant did not testify to dispute their accounts.

7. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures...." Similarly, Article I, Section 8 states that, "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures."

and its progeny: such a detention is lawful if supported by reasonable suspicion because, although it subjects a suspect to a stop and a period of detention, it does not involve such coercive conditions as to constitute the functional equivalent of an arrest. The final category, the arrest or custodial detention, must be supported by probable cause. *See Ellis,* 662 A.2d at 1047–48; *see also In the Interest of D.M.,* 781 A.2d at 1164. This Court has acknowledged this approach to police/citizen encounters under both the Fourth Amendment and Article I, Section 8. *See Commonwealth v. Polo,* 563 Pa. 218, 759 A.2d 372, 375 (2000) (construing Article I, Section 8); *Ellis,* 662 A.2d at 1047 ("Fourth Amendment jurisprudence has led to the development of three categories of interactions between citizens and police."). *Accord In the Interest of D.M.*

Appellant argues that her initial encounter with Trooper Hodges, which preceded the seizure of the black bag containing the cocaine, was an investigative detention. Appellant stresses the fact that she was not informed that she was free to leave and further notes that the officers placed her between them, *i.e.,* Agent Paret was standing in the aisle behind her, while Trooper Hodges was in front of her in the well before the exit door of the bus. Appellant asserts that Trooper Hodges did not have a reasonable, articulable suspicion to detain and question her and, therefore, he was prohibited from questioning her about the bag under her seat. In taking the bag, appellant argues, Trooper Hodges conducted an illegal seizure and the crack cocaine found in the bag must be suppressed. Appellant also argues that she cannot be deemed to have voluntarily abandoned the bag because her disavowal of ownership only followed the illegal police conduct in approaching her on the bus without suspicion. Finally, appellant argues that the statements she made to Trooper Hodges before being read her rights under *Miranda* must be suppressed because she was in custody at that point as a result of the investigative detention, while her post-*Miranda* statements are the excludable fruit of the various antecedent illegalities.

The Commonwealth responds that the encounter on the bus was a mere encounter, which did not need to be supported by any level of suspicion. The Commonwealth notes that the fact that appellant was not told that she was free to leave is but one factor in the analysis of whether a seizure occurred, and the totality of the circumstances show that she in fact was not "seized" prior to the police discovery of the black bag at her feet. On the question of abandonment, the Commonwealth echoes its view that there was no antecedent seizure, and then cites this Court's decision in *Commonwealth v. Dowds*, 563 Pa. 377, 761 A.2d 1125, 1129 (2000) for the proposition that appellant's denial of ownership of the bag, in a circumstance involving a mere encounter, was enough to establish abandonment. Finally, the Commonwealth argues that appellant was not in custody at the time she made her statements before being given *Miranda* warnings, and her subsequent statements were admissible since they were not the fruit of any prior illegality.

There is little question but that the initial encounter on the bus in these circumstances was not a seizure under the Fourth Amendment. In *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the U.S. Supreme Court held that the questioning of a passenger by a police officer during a scheduled stop of a commercial bus is not necessarily a seizure under the Fourth Amendment. The Court noted its own settled authority that the mere approach of police followed by police questioning, including requests to examine identification and requests for consent to search, generally does not amount to a seizure. The situation in *Bostick* was similar to that present here: the approach and questioning occurred "in the cramped confines of a bus." In the view of the Florida Supreme Court, whose judgment was under review in *Bostick*, that circumstance made the critical difference, indeed, so much so that the state court had "adopted a *per se* rule prohibiting the police from randomly boarding buses as a means of drug interdiction." In so holding, the Florida court focused on the fact that the subject of such police questioning

would not feel "free to leave." 501 U.S. at 435, 111 S.Ct. at 2386–87.

In outlining the proper approach for evaluating whether a seizure has occurred in the bus passenger/ drug interdiction paradigm, the *Bostick* Court rejected outright both the Florida court's *per se* approach and its focus on whether the bus passenger would feel free to leave. The Court did not dispute that the bus setting differed from encounters on the street or in other public spaces. But, the Court noted, the fact that a person on a bus may not feel free to leave is a function of his having decided to utilize a bus for travel, and not a result of coercive conduct on the part of police; accordingly, the "free to leave" test for a seizure is inapt. Instead, the relevant Fourth Amendment question is simply whether, taking into account all of the circumstances surrounding the encounter, "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 437, 111 S.Ct. at 2387. In this analysis, the location of the encounter is one factor, but it is not the only factor. Having rejected the Florida Supreme Court's approach and its *per se* rule, the Court did not offer its view on whether the encounter in *Bostick* was in fact a seizure, but instead remanded the case for reconsideration under the proper constitutional test. However, the Court did cite two factors it deemed worth considering on remand: the officer, though armed, did not remove his weapon or employ it in a threatening manner; and the police had advised the passenger of his right to refuse consent. *Id.* at 436–37, 111 S.Ct. at 2387.

Recently, the Supreme Court had further occasion to address questions unique to the bus passenger/drug interdiction arena in *United States v. Drayton,* 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). *Drayton* involved consent searches of two bus passengers following a drug interdiction encounter. The question framed in *Drayton* was whether the Fourth Amendment requires the police conducting such an interdiction to inform the passengers of their right to refuse to cooperate and/or to consent to a search. The Eleventh Circuit had adopted what was "in effect a *per se* rule" similar to the

rule adopted by the lower court in *Bostick*, that evidence obtained during suspicionless drug interdiction efforts aboard buses must be suppressed unless the right to refuse to cooperate or consent to a search was conveyed to the passenger. 536 U.S. at 202–03, 122 S.Ct. at 2111–12. The Supreme Court deemed the *per se* approach to be erroneous, and reaffirmed the totality of the circumstances test set forth in *Bostick*.

Applying *Bostick*, the *Drayton* Court concluded that the passengers were not seized when the officers boarded the bus and asked questions, notwithstanding the failure to communicate to the passengers their right to refuse to cooperate. The Court instead emphasized the absence of other coercive factors:

> There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice. It is beyond question that had this encounter occurred on the street, it would be constitutional. The fact that an encounter takes place on a bus does not on its own transform standard police questioning of citizens into an illegal seizure.

536 U.S. at 204, 122 S.Ct. at 2112. The Court also rejected the notion that the fact that one officer displayed his badge, while another positioned himself at the front of the bus, converted the encounter into a seizure. *Id.* at 204–05, 122 S.Ct. at 2112–13.

Turning to the closely-related question of whether the ensuing consent to search was voluntary, the *Drayton* Court concluded that the consent was voluntary, noting that, "[i]n circumstances such as these, where the question of voluntariness pervades both the search and seizure inquiries, the respective analyses turn on very similar facts." *Id.* at 206, 122 S.Ct. at 2113. The Court noted that it had already specifically rejected the suggestion that police officers must always inform citizens of their right to refuse a request to search; instead, this is just one factor in the totality analysis. *Id.* at 206–07, 122 S.Ct. at 2113–14 (citing *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) and *Schneckloth v. Busta-*

*monte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).[8] The Court stressed that, although the police in *Drayton* did not inform the passengers of their right to refuse the request to search, they did ask for permission to search and nothing police said "indicated a command to consent to the search." *Id.,* 122 S.Ct. at 2113. The Court then concluded with the following observation concerning the very nature of a consent search:

> In a society based on law, the concept of agreement and consent should be given a weight and dignity of its own. Police officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences of coercion.

*Id.* at 207, 122 S.Ct. at 2113.

■ Here, as in *Drayton,* the police conduct preceding the seizure of the black bag was not so coercive as to amount to a seizure of appellant's person. Trooper Hodges and Agent Paret boarded this bus, with the driver's permission, while it was already parked at the King of Prussia bus terminal on a regularly scheduled stop. The officers were dressed in plain clothes, but wearing jackets that clearly identified them as police officers. Upon boarding the bus, they introduced themselves and explained their purpose.[9] The officers did not

---

**8.** As a state constitutional matter, this Court has followed federal law on the question of what is necessary for consent to be deemed voluntary, employing a totality of the circumstances test, and not requiring a showing of the awareness of the right to refuse consent. *Commonwealth v. Cleckley,* 558 Pa. 517, 738 A.2d 427, 432–33 (1999).

**9.** At one point, appellant states that "the mere entry of the officers onto the bus rises to at least the level of an 'investigative detention.'" Appellant's Brief, 9. We disagree. In addition to the fact that such a statement flies in the face of the Supreme Court's admonition against *per se* rules, mere police presence is not so inherently coercive as to effect a seizure of all persons on a bus. In this regard, it is important to recognize that *Bostick's* objective, reasonable person test presupposes an **innocent** person. 501 U.S. at 438, 111 S.Ct. at 2388 (citation omitted). It is not self-evident that reasonable, innocent people would feel incapable of declining police requests or terminating an encounter on a bus. Moreover, as *Drayton* emphasized, when such persons

single out appellant, but rather spoke to each passenger in turn, using a normal tone of voice. Thus, as in *Drayton*, police here "gave the passengers no reason to believe that they were required to answer the officers' questions." 536 U.S. at 203, 122 S.Ct. at 2112.

When Trooper Hodges reached appellant's seat, he requested to view her identification and ticket and asked questions regarding her destination and luggage. At no time did Trooper Hodges brandish a weapon, raise his voice, threaten appellant, or accuse her of criminal conduct. In addition, the officers kept the aisle clear and made sure that the door to the bus was open. When Trooper Hodges asked appellant if the bag by her feet was hers, she denied ownership of it. Appellant was not questioned about narcotics possession, nor was it apparent that the bag to which she denied ownership contained narcotics. At that point, after appellant's denial of ownership, and after the failure of any of the other passengers to claim the bag, police concluded that it was abandoned, and searched it. Only upon conducting that search were narcotics detected. Nothing that was said or done by the officers at the point appellant disowned the bag would have suggested to a reasonable person that she was barred from leaving the bus or terminating the encounter, much less did the police conduct coerce a denial of ownership of the bag. Moreover, in light of *Drayton*, the mere fact that appellant was not specifically informed that she could refuse to cooperate and was free to end the encounter did not make the encounter a seizure for Fourth Amendment purposes. *Accord Dowds*, 761 A.2d at 1130 ("Although in some circumstances the presence or absence of an admonition that the citizen-subject is free to depart will be a significant factor, ... the universal requirement of a prophylactic warning as advocated by Dowds would be inconsistent with the [totality of the circumstances] precept."). Accordingly, we conclude that appellant was not

cooperate, it is likely that they "answer officers' questions and otherwise cooperate not because of coercion but because the passengers know that their participation enhances their own safety and the safety of those around them." 536 U.S. at 205, 122 S.Ct. at 2113.

seized at this point and, therefore, the later discovery of incriminating evidence is not tainted by the initial encounter.

This case is unlike *Drayton* in that the initial mere encounter was not followed by a consent to search but by an abandonment of the property in which police ultimately found controlled substances. On the question of the validity of this abandonment, we agree with the Commonwealth that this Court's decision in *Dowds* controls. In *Dowds,* we noted that:

> This Court has not previously addressed whether a defendant's denial of ownership, standing alone, is sufficient to constitute abandonment. . . . Notably, a number of other jurisdictions have found abandonment based upon a disclaimer of ownership in response to police questioning. *See generally* Annotation, *Search and Seizure: What Constitutes Abandonment of Personal Property Within Rule That Search and Seizure of Abandoned Property is not Unreasonable—Modern Cases,* 40 A.L.R.4th 381, §§ 21–25.5 (2000) (collecting cases); 1 LAFAVE, SEARCH AND SEIZURE § 2.6(b), at 581–89 (same). Where, as here, an individual's disclaimer of ownership is not the product of improper police conduct and clearly indicates her intention, we can perceive no basis for treating it differently than an act from which an intention to abandon may be inferred. *Cf. [Commonwealth v.] Shoatz,* 469 Pa. [545,] 554, 366 A.2d [1216,] 1220 [(1976)] (concluding that act of dropping luggage and fleeing sufficiently indicated abandonment of privacy expectation).

761 A.2d at 1131. Here, no less than in *Dowds,* appellant's repeated and affirmative denial of ownership of the bag manifested an intention to relinquish any privacy expectations she had in the bag and that manifestation was not the coerced product of an illegal seizure. Therefore, appellant's Fourth Amendment rights were not violated by the seizure and search of the bag.

We now turn to the question of whether appellant was seized prior to her disowning the bag in question under Article I, Section 8 of the Pennsylvania Constitution. Although ap-

pellant makes a general reference to a Superior Court case recognizing that Article I, Section 8 "provides greater protection" than the Fourth Amendment, Appellant's Brief at 11, she does not forward a specific argument, grounded in the text of the provision, its history, related case law, or policy concerns which would militate in favor of a finding that, for Pennsylvania constitutional purposes, she must be deemed to have been seized at the point when the officers asked her if the black bag was hers. *See Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991).[10] This Court has indeed accorded greater protections to the citizens of this state under Article I, Section 8 than under the Fourth Amendment in certain circumstances, but we have repeatedly emphasized this alone "does not command a reflexive finding in favor of any new right or interpretation asserted." *Commonwealth v. Duncan,* 572 Pa. 438, 817 A.2d 455, 459 (2003) (collecting cases). We have not hesitated to follow the prevailing Fourth Amendment standard in appropriate instances. *Commonwealth v. Cleckley,* 558 Pa. 517, 738 A.2d 427, 431–32 (1999) (collecting cases).

Although appellant neither cites *Edmunds* nor develops an *Edmunds*-based or policy-based state constitutional argument in favor of her assertion that she was seized when the officers approached her on the bus and questioned her, she does invoke this Court's Article I, Section 8 decision in *Commonwealth v. Polo,* 563 Pa. 218, 759 A.2d 372 (2000). Accordingly, appellant is certainly entitled to the benefit of that state constitutional decision.[11] *Polo,* however, is materially distinguishable.

10. In *Edmunds,* this Court articulated a four-part methodology to aid in evaluating state constitutional claims. Under *Edmunds,* the party arguing in favor of distinct or greater rights under the Pennsylvania Constitution should analyze: (1) the text of the Pennsylvania constitutional provision; (2) the history of the provision, including Pennsylvania case law; (3) related case-law from other states; and (4) policy considerations unique to Pennsylvania. *Id.* at 895; *see also Commonwealth v. Cleckley,* 558 Pa. 517, 738 A.2d 427, 430 n. 5 (1999).

11. Appellant also cites to a divided panel decision of the Superior Court, *Commonwealth v. Vasquez,* 703 A.2d 25 (Pa.Super.1998), *alloc. denied,* 564 Pa. 709, 764 A.2d 1069 (2000), in which the panel majority disapproved of a drug interdiction at a scheduled bus stop finding, *inter alia,* that police had "seized" the bus by boarding it with the permission

In *Polo*, Agent Paret and Officer Kirk Schwartz of the Delaware Water Gap Police Department approached a Greyhound bus as it neared a tollbooth on Interstate 80 and requested that the driver pull the bus to the side of the road after paying the toll. The bus driver agreed and pulled over. The officers asked the driver for the passengers' tickets, which revealed one "quick turn" ticket from Cleveland to New York and back, which indicated that the purchaser spent only eight hours in New York. The officers then boarded the bus, wearing attire indicating that they were law enforcement officials, and Agent Paret approached Polo, who had the other half of the quick turn ticket. Paret asked Polo if he had any bags, and Polo responded in the negative. The officers then matched every bag on the bus with a passenger, except for one, which Polo then claimed as his. The officers then asked Polo if they could search the bag and Polo responded "okay." Agent Paret found cocaine in the bag and arrested Polo.

The trial court denied Polo's motion to suppress the cocaine, finding that the interaction between Polo and the officers was a mere encounter. The Superior Court reversed, holding that the officers illegally detained the bus and that Polo's consent to search the bag was tainted by the illegal stop. This Court affirmed in a divided opinion, electing to base its holding exclusively upon Article I, Section 8 of the Pennsylvania Constitution, and not reaching the question of whether the seizure was lawful under the Fourth Amendment.

In disapproving of the consent search, the *Polo* majority did not rely upon the specifics of the officers' interaction with Polo once the bus was stopped, but instead focused upon the simple fact of the officers' "randomly stopping" the bus at the toll plaza on a restricted access highway in the first place. The

of the bus driver; that the seizure was unlawful because it was unsupported by reasonable suspicion; and that the passenger's ensuing consent to a search was not voluntary. In addition to not being binding upon this Court, *Vasquez* is distinguishable from the matter *sub judice*. The *Vasquez* Court found that the bus was seized because the officers detained the bus, preventing continuation of the scheduled trip, until they completed their investigation. Here, in contrast, Agent Paret and Trooper Hodges did not delay the departure of the bus.

majority rejected the Commonwealth's argument that stopping the bus was a mere encounter, instead concluding that it was "an investigative detention since the purpose of the stop ... was for the purpose of conducting a drug interdiction investigation." 759 A.2d at 376. In so holding, the majority cited to *Commonwealth v. Swanger*, 453 Pa. 107, 307 A.2d 875 (1973)—a case decided exclusively under the Fourth Amendment—for the proposition that police cannot lawfully stop a vehicle and detain its passengers without first observing a violation of the Motor Vehicle Code. *Polo*, 759 A.2d at 376. The majority noted that: " 'To hold otherwise would be to give the police absolute, unreviewable discretion and authority to intrude into an individual's life for no cause whatsoever.' " *Id.* (quoting *Swanger*, 307 A.2d at 878). Because there was no indication of criminal activity or a Motor Vehicle Code violation to support the stop of the bus, the *Polo* majority held that the stop was illegal. In so holding, the majority did not suggest that the result would have been any different under the Fourth Amendment: it simply elected not to reach that question.

Mr. Justice Saylor filed a Concurring and Dissenting Opinion in *Polo*, which was joined by this author, agreeing that the consent seizure of the cocaine was tainted by an illegal detention, but relying on Fourth Amendment grounds. Justice Saylor invoked *Bostick's* objective, totality of the circumstances test, weighing the fact of "the interruption of the normal activity of a commercial bus by removing it from the stream of traffic at a highway tollbooth" along with all other relevant factors. 759 A.2d at 379–80 (Saylor, J., concurring and dissenting). Madame Justice Newman filed a Dissenting Opinion, noting that she too would not have reached the Pennsylvania constitutional claim, and explaining why she believed that, under *Bostick*, no seizure occurred. *Id.* at 377–79 (Newman, J., dissenting).

Here, unlike *Polo*, the officers did not stop the bus on which appellant was a passenger and remove it from its scheduled route. The bus here was already on a scheduled stop of its own when the officers boarded it. Nor did the officers delay

the bus or interrupt its normal activities. Since the single fact essential to the state constitutional holding in *Polo* is not present here, appellant's reliance on *Polo* is misplaced. Nor does *Polo* provide persuasive authority for a state constitutional holding that appellant was seized when police approached her on the bus and posed questions to her. The *Polo* majority opinion never discussed or evaluated the interaction between the officers and the passengers beyond the controlling fact of the stop of the bus while in transit. Nor did the *Polo* majority suggest that there was something unique to Article I, Section 8 that required a different approach to bus encounters than the approach employed under the Fourth Amendment; indeed, as noted above, the majority relied upon a Fourth Amendment-based decision for the proposition that a vehicle cannot be stopped absent specific facts justifying the intrusion. *Polo* is therefore inapposite.

Appellant suggests, however, that this Court has already extended the *Polo* seizure holding to situations where a bus was boarded by police at a scheduled stop in the *per curiam* decision in *Commonwealth v. Cooke*, 563 Pa. 587, 763 A.2d 809 (2000). In *Cooke*, this Court summarily reversed an unreported decision of the Superior Court, citing *Polo*, without further elaboration, as the reason for reversal. Justice Saylor filed a Dissenting Statement, which this Justice joined. Appellant would read more into the *per curiam* decision by looking to the Dissenting Statement for the facts of the case, and then attaching the *Polo* holding to those facts. But the mandate in *Cooke* was not the voice of the dissenting Justices, and there is no reason to conclude that the Justices who agreed on that mandate accepted the dissenters' view of the facts, the procedural posture of the case, the issue presented, and the possible confusion that would attend the *per curiam* decision. While an unexplained *per curiam* decision is certainly binding as the law of that case, by definition it establishes no precedent beyond the authority cited in the order—which is *Polo* itself. By allowing appeal in the case *sub judice*, and rendering our decision in a case unquestionably posing the circumstances

that concerned the *Cooke* dissenters, we have removed whatever uncertainty may have arisen in the wake of *Cooke*.

In summary, the existing authority under Article I, Section 8 does not support appellant's claim that she should have been legally deemed to have been seized when the police merely boarded a bus which was in the midst of a scheduled stop and posed questions to her. In addition, appellant has articulated no persuasive reason grounded in experience or policy particular to Article I, Section 8, which weighs in favor of a departure from the U.S. Supreme Court's totality of the circumstances approach to drug interdiction encounters in contexts such as this, where the bus has not been stopped by police action. Accordingly, we decline to depart from the governing federal authority and we hold that appellant was not subject to an investigative detention at the time she disavowed ownership of the black bag containing cocaine.

Turning to the *Miranda* question, appellant contends that the statements she made to Trooper Hodges after she exited the bus should be suppressed because she was in custody at that time and had not yet been given *Miranda* warnings. Appellant submits that, by the time she left the bus, she was obviously the focus of the police investigation, as she was the only passenger asked to exit the bus. She also suggests that Trooper Hodges had subjectively concluded that he was not going to let her go on her way, and speculates that the trooper's "body language" may have conveyed that fact, even in the absence of explicit words telling her she was not free to leave. Appellant also submits that the very nature of Trooper Hodges' exchange with her—such as informing her of the ways by which police could ascertain the identity of the bag's owner—necessarily conveyed that she was not free to leave. Under these circumstances, appellant claims, a reasonable person would believe that she was not free to leave and that she was in custody and entitled to *Miranda* warnings. In a derivative argument, appellant also claims that the additional statements made after she was given *Miranda* warnings should be suppressed as the fruit of an illegal arrest which was based upon the tainted statements. The Commonwealth

responds that the initial comments made by appellant after she exited the bus were not the product of a custodial interrogation and, thus, *Miranda* warnings were not necessary.

*Miranda* warnings are only required when a defendant is subject to a custodial interrogation. *Commonwealth v. Fisher*, 564 Pa. 505, 769 A.2d 1116, 1125 (2001); *Commonwealth v. Johnson*, 556 Pa. 216, 727 A.2d 1089, 1100 (1999); *Commonwealth v. Gwynn*, 555 Pa. 86, 723 A.2d 143, 149 (1998); *Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181, 1188 (1996). A person is in custody for purposes of *Miranda* only when the objective circumstances suggest that she was physically deprived of her freedom or was in a situation where she reasonably could have believed that her freedom of movement was being restricted. *See Commonwealth v. Gibson*, 553 Pa. 648, 720 A.2d 473, 480 (1998); *Commonwealth v. Rucci*, 543 Pa. 261, 670 A.2d 1129, 1139 (1996). *See also Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528–29, 128 L.Ed.2d 293 (1994) (*per curiam*) (" 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest' ") (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)) (further citation omitted). The fact that the officer questioning a person has "focused" on that individual does not in itself prove custody for *Miranda* purposes. *See Minnesota v. Murphy*, 465 U.S. 420, 431, 104 S.Ct. 1136, 1144, 79 L.Ed.2d 409 (1984); *Beckwith v. United States*, 425 U.S. 341, 347–48, 96 S.Ct. 1612, 1616–17, 48 L.Ed.2d 1 (1976). Similarly, the fact that the officer subjectively believes that the individual being interviewed is a suspect is irrelevant to the question of custody, if the officer has not communicated the fact to the individual. *Stansbury*, 511 U.S. at 324, 114 S.Ct. at 1530 ("Save as they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the *Miranda* custody inquiry."); *Gibson*, 720 A.2d at 480 ("[T]he test for custodial interrogation does not depend

upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes his freedom of action is being restricted.") (quoting *Commonwealth v. Williams*, 539 Pa. 61, 650 A.2d 420, 427 (1994)).

We agree with the courts below that appellant was not in custody when she made the statements to Trooper Hodges outside of the bus and, therefore, *Miranda* warnings were not required before the interview could continue. After Trooper Hodges discovered the cocaine in the abandoned bag found near appellant, he requested that appellant speak with him outside of the bus. Appellant voluntarily agreed to accompany the trooper. He did not physically touch her, accuse her of any crime, or order her to accompany him. Trooper Hodges conducted the interview in an open parking lot, near to the bus; he did not isolate her in a private room or transport her any distance from the bus. At least so far as the objective circumstances presented themselves, there was nothing to prevent appellant from terminating the interview and returning to the bus. Appellant was neither physically deprived of her freedom, nor was she placed in circumstances that would have led a reasonable person to believe that her freedom of movement had been effectively hampered to the extent that it amounted to a formal arrest. *Contrast, Commonwealth v. Medley*, 531 Pa. 279, 612 A.2d 430, 433 (1992) (appellant was subject to custodial interrogation because his freedom of movement was restricted when he was frisked, placed in handcuffs, transported to police station and placed in secure waiting area to be questioned). Moreover, appellant's focus upon Trooper Hodges' alleged subjective intention not to permit appellant to leave is misplaced since that intent was never communicated to appellant. Appellant's speculation that the trooper somehow conveyed this intent through his body language is unsupported by the record; in this regard, it is notable that appellant elected not to testify, and she never claimed that such an intention was communicated to her through non-verbal means.

After appellant admitted that the bag containing the cocaine was hers, an admission that unquestionably generated probable cause to arrest, Trooper Hodges requested that appellant accompany him inside the bus terminal. Once inside the terminal, appellant was arrested, was given *Miranda* warnings, and made further statements. Since those custodial statements followed upon a valid waiver untainted by any prior illegality, they were properly deemed admissible, as were the packets of marijuana found in appellant's purse in a lawful search incident to arrest.

For the above reasons, we find that the courts below properly denied appellant's motion to suppress both the contraband seized from her and her incriminating statements. Accordingly, we affirm the order of the Superior Court.

Former Chief Justice FLAHERTY did not participate in the consideration or decision of this case.

Former Chief Justice ZAPPALA did not participate in the decision of this case.

Justice NIGRO files a dissenting opinion.

Justice NIGRO, dissenting.

I respectfully dissent from the majority opinion as I believe that the interaction between Smith and the officers on the bus constituted an unlawful seizure.

Here, as the majority notes, the officers boarded the bus, identified themselves as police officers, and explained to the passengers the purpose of the interdiction. The officers approached Smith who was in the front row, asked to see her ticket and identification, and inquired about her luggage. While talking with Smith, one officer stood in the stairwell of the bus and the other stood behind her. In support of its determination that this interaction between Smith and the officers did not amount to a seizure, the majority relies upon the fact that the officers did not block the aisle, brandish a weapon, raise their voices, threaten Smith, or accuse her of criminal conduct. However, as I explained in both the opinion in support of reversal in *Commonwealth v. Boswell*, 554 Pa. 275, 721 A.2d 336 (1998), and my dissenting opinion in *Com-*

*monwealth v. Dowds*, 563 Pa. 377, 761 A.2d 1125, 1132 (2000), police officers inherently display their authority and are intimidating solely by virtue of their position. Thus, when an officer approaches a person and identifies himself as a police officer, even if that officer never brandishes a weapon and never speaks in anything but a conversational and non-accusatory tone of voice, an average person, in reality, simply does not feel "free to leave" and accordingly, is seized.[1]

As I believe that an average person would not feel free to leave under the circumstances here, Smith was, in my mind, illegally seized and I would therefore reverse the order of the Superior Court.

**1.** In *Boswell*, I suggested that police should give the following warning when conducting a random stop of someone based upon a drug courier profile:

> We are police officers investigating drug trafficking. We approached you on a purely random basis and would like to ask you some questions. You have a legal right to decline our requests, a right to refuse to cooperate, and you are free to leave. If you choose not to leave and to comply with our requests, anything revealed through those inquires may be used against you in legal proceedings. Furthermore, if you agree to cooperate at the outset, you may still refuse at any time to cooperate further; you may end the inquiry and leave. Do you understand that you are under no obligation to comply with our requests at this time?

721 A.2d at 344 n. 1.