J-A16044-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
v.   :
  :
  :
  :
SEAN LEWIS QUARLES   :
  :
Appellant   :   No. 1493 MDA 2020

Appeal from the Judgment of Sentence Entered September 30, 2020
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0004263-2018

BEFORE:   KUNSELMAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:        **FILED: AUGUST 5, 2021**

Appellant, Sean Lewis Quarles, appeals from the judgment of sentence entered in the Court of Common Pleas of Dauphin County following his conviction by a jury on one charge of possession with the intent to deliver a controlled substance and two charges of possession of a controlled substance.[1] After a careful review, we affirm.

The relevant facts and procedural history are as follows:  Appellant was charged with various drug offenses after the police stopped and searched his

---

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30) and (a)(16), respectively.  Appellant was also convicted of driving while operating privileges are suspended or revoked, 75 Pa.C.S.A. § 1543(a), operating a vehicle without financial responsibility, 75 Pa.C.S.A. § 1786(f), and vehicle registration suspended, 75 Pa.C.S.A. § 1371(a).

vehicle. On June 4, 2019, he filed a counseled pre-trial motion seeking to suppress the physical evidence seized by the police during the search. On July 15, 2019, the matter proceeded to an evidentiary hearing at which Harrisburg City Police Officer Christopher Palamara and Appellant testified.

Specifically, Officer Palamara, who has been a police officer for over ten years, testified that, on May 13, 2018, he was sitting in his marked patrol vehicle at the intersection of North 6th Street and Schuylkill Street running vehicle registrations through his cruiser's computer. N.T., 7/15/19, at 7. At approximately 1:00 p.m., the officer ran the registration for an Infiniti and discovered the vehicle's registration was suspended. *Id.* at 9. He then ran the owner's information, discovered Appellant was the registered owner, and learned Appellant's driver's license was suspended. *Id.*

Officer Palamara began to follow the vehicle and initiated a traffic stop by using his overhead emergency lights. *Id.* Appellant stopped his vehicle at a strip mall near a laundromat on the 2700 block of Agate Street, and he immediately exited the vehicle from the driver's side. *Id.* at 9, 12. Officer Palamara exited his police vehicle, leaving the emergency lights activated, and he instructed Appellant to get back into his vehicle. *Id.* at 12, 19. Although Appellant initially questioned why he needed to re-enter his vehicle, he did so. *Id.* at 13.

Officer Palamara approached the driver's side of Appellant's vehicle and asked him for his registration, insurance, and driver's license. *Id.* at 14.

Appellant did not provide any of the requested documents. ***Id.*** Appellant admitted he was the owner of the vehicle, and he acknowledged his driver's license was suspended. ***Id.***

Officer Palamara testified that, after he asked Appellant for the vehicle's information, he informed Appellant he had stopped the vehicle for lack of a valid registration. ***Id.*** at 15. Officer Palamara indicated they "talked about that for an extended amount of time as far as like questions and why." ***Id.*** The officer testified that, as a matter of routine, he asked Appellant whether he was on probation or parole, and Appellant admitted he was on parole for gun charges. ***Id.*** At this point, approximately five minutes into the traffic stop, another police officer, Officer Cummings,[2] arrived on the scene in a marked patrol vehicle in order to assist Officer Palamara. ***Id.*** at 15-16.

Officer Cummings approached the driver's side of Appellant's vehicle where Officer Palamara and Appellant were conversing. ***Id.*** at 17. Since Appellant was unable to provide any vehicle documentation or a driver's license, Officer Palamara returned to his police cruiser to seek additional information. ***Id.*** Meanwhile, Officer Cummings continued to stand by the driver's side of Appellant's vehicle with Appellant sitting in the driver's seat. ***Id.***

---

[2] Officer Cummings' first name does not appear in the record.

Officer Palamara rejoined Officer Cummings at the driver's side of Appellant's vehicle. *Id.* at 18. He informed Appellant "he wasn't going to be able to drive the vehicle because his license was suspended and he didn't have insurance on the vehicle, that he would have to call and make arrangements for the vehicle to get picked up." *Id.*

Officer Palamara testified he then "moved [his] patrol vehicle out of the way and turned off the overhead emergency lights. [He] told Officer Cummings to stay with [Appellant's] vehicle, with [Appellant] as well, as [he] did that." *Id.* at 19. Officer Palamara admitted that, unbeknownst to him, when he turned off his overhead emergency lights, he switched the lights so that the light bar at the back of his cruiser was flashing. *Id.* at 19-20.[3]

Officer Palamara rejoined Officer Cummings, and Appellant then exited his vehicle. *Id.* Officer Cummings turned off his cruiser's lights during which time Officer Palamara again informed Appellant he would be unable to drive away in his vehicle. *Id.* However, the officer permitted Appellant to move his vehicle into a parking space, which was parallel to Officer Palamara's cruiser. *Id.* at 20.

---

[3] Officer Palamara testified he did not realize he had switched the cruiser's lights so that the rear light bar was flashing. *Id.* at 19. He testified that, from the vantage point of Appellant's car, the flashing lights were not visible, and they became visible only when the officer later walked more than halfway back to his police cruiser. *Id.* at 19-20.

Officer Cummings, Appellant, and Officer Palamara then gathered near the trunk of Appellant's vehicle. *Id.* at 21. Officer Palamara testified he "was finishing up with [Appellant] as far as—[he] told him he would receive a citation in the mail for the traffic offense and that he would have to respond back to it and then [he] explained to him he couldn't drive, he'd have to contact somebody to get his vehicle." *Id.* Officer Palamara further testified he asked Appellant if he had any questions, and Appellant stated that he did not. *Id.*

Officer Palamara indicated he "told [Appellant] he was free to go[,]" and he and Officer Cummings began walking away from Appellant's vehicle. *Id.* Officer Palamara testified:

> I witnessed [Appellant] walking away from his vehicle, walking towards the buildings there where he was parked in front of. At that point, I asked him if I could ask him a question and then he turned around and he started to approach me from behind to walk around his vehicle to walk towards me.

*Id.* at 22.

Officer Palamara clarified he was standing approximately ten feet away from Appellant's vehicle and near a different parked vehicle when he asked Appellant whether he "could ask him a question." *Id.* at 22, 24, 35. He then waited in that position by the unrelated parked vehicle while Appellant turned, walked to the officer, and stood face-to-face to him so that they could converse. *Id.* at 24.

Officer Palamara testified:

And then after that point, I said, I know you—because during my contact with him, one of the things I asked him when he was on state parole is, is there anything in the vehicle I need to be concerned about?  And he stated that there wasn't.  So after I told him or I asked him, can I ask you a question, I said, you know, I know before you stated that there wasn't anything in the vehicle I need to be concerned about, is it okay if I search your vehicle?

*Id.* at 22.

Officer Palamara testified Appellant said, "[I]f you want to search the vehicle you can[.]" *Id.* at 25.  In response, Officer Palamara asked Appellant to stand towards the back of Appellant's vehicle with Officer Cummings. *Id.* Officer Palamara began searching Appellant's vehicle, and he discovered "drugs and cash" inside of the vehicle.[4] *Id.* at 26.

At this point, and for the first time since the officer had effectuated the stop of Appellant's vehicle, Appellant was placed in handcuffs. *Id.* at 27. Further, the officer indicated that at no point did either he or Officer Cummings draw their weapons, and during the entire encounter, including during the initial traffic stop, the conversation was "casual" with no angry or emotional words spoken by either the officers or Appellant. *Id.* Moreover, Officer Palamara confirmed he and Officer Cummings were the only two officers that were on the scene, and no other officers joined them at any point. *Id.* at 28.

---

[4] The officer testified he was unable to recall whether Appellant's vehicle was unlocked or whether he asked Appellant for keys to open the vehicle. *Id.* at 26.

On cross-examination, Officer Palamara confirmed the sole reason he effectuated a stop of Appellant's vehicle was due to a suspended registration, and he had no probable cause of criminal activity beyond the violation. *Id.* He also admitted that, from the time Officer Cummings arrived on the scene until Appellant began walking away after the police informed him that he could not drive the vehicle, one of the officers was always standing by the driver's side window of Appellant's vehicle. *Id.* at 32. Officer Palamara reiterated that the entire conversation between the officers and Appellant was "amicable[.]" *Id.* at 34.

Officer Palamara explained that, after Appellant consented to the search of his vehicle, he asked Appellant to stand near Officer Cummings for the officers' safety. *Id.* at 38. He also indicated he wanted Appellant to stand by Officer Cummings so that if Appellant wanted to "recant his consent…[O]fficer [Cummings] would be with him to tell me that." *Id.*

Appellant testified he was the driver of the subject vehicle. *Id.* at 40. He then testified as follows on direct examination by defense counsel:

> Q. I have only one question regarding the stop. At the point in time when the officer backed the patrol vehicles away, were you able to see the flashing lights?
>
> A. Yes, I was.
>
> Q. Where could you see them?
>
> A. In his rear lights.
>
> Q. Even when the rear of the car was facing away from you, were you still able to tell they were flashing?
>
> A. Yeah, because I had my eyes locked on them the whole time. I wasn't too sure what was going on.

- 7 -

Q. Could you see them on the car? Could you see the reflection? How would you see them at this point?

A. Well, I seen [*sic*] them as he's reversing. I seen [*sic*]—as he's reversing. I seen [*sic*] the lights on because I was wondering why his partner was still there and why he was reversing. Then I kind of noticed what was going on.

[DEFENSE COUNSEL]: No further questions.

*Id.* at 40-41.

On cross-examination, Appellant testified he is twenty-nine years old, and he has his GED. *Id.* at 41. Appellant admitted he has had many contacts with the police throughout his life. *Id.* at 42.

Appellant testified Officer Palamara's tone of voice changed during Appellant's interaction with him. *Id.* Specifically, he testified the officer's tone of voice "chang[ed] because it started off one way, then by the time he engaged the second stop, he didn't ask me could he ask me a question. He actually demanded questions on me. So he made me feel as though I didn't have a choice." *Id.* at 41-42. Appellant admitted the officer did not give him any "ultimatums." *Id.* at 43. However, Appellant indicated "[the officer] forcefully asked me questions on his own will." *Id.* at 44.

Appellant admitted that, after the officer told him he was free to go, he began walking away toward a laundromat as he was "absolutely" done talking to the police. *Id.* Appellant further admitted that, after Officer Palamara called out to him, he changed course and went back to speak to the officer. *Id.* at 43-44. Appellant testified he "was indecisive as [he] was walking

towards [the officer] because [he] was actually going inside of the laundromat." *Id.* at 44.

Appellant denied that he gave Officer Palamara consent to search his vehicle. *Id.* at 45. He specifically indicated he told the officer he was "not okay" with him searching his vehicle, and the officer "forced" the car key from his hand. *Id.*

By order entered on November 6, 2019, the trial court denied Appellant's pre-trial motion to suppress the physical evidence, and Appellant proceeded to a jury trial on August 17, 2020. The jury convicted Appellant of the offenses indicated *supra*.

On September 30, 2020, the trial court sentenced Appellant to an aggregate of 30 months to 60 months in prison, and Appellant filed a timely counseled post-sentence motion, which the trial court denied on November 6, 2020. This timely counseled appeal followed on November 20, 2020. All Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant sets forth the following issues in his "Statement of Questions Presented" (verbatim):

> 1. Whether the trial court erred when it failed to suppress the evidence resulting from an illegal search and seizure that violated Appellant's rights under the Fourth Amendment wjen [*sic*] the Officer reengaged Appellant after the completion of the traffic stop?
>
> 2. Whether the trial court erred in denying the motion for mistrial when a Commonwealth's witness referred to Appellant having been previously incarcerated, violating the pretrial ruling preventing such statements?

Appellant's Brief at 9.

In his first issue, Appellant contends the trial court erred in denying his pre-trial motion to suppress the evidence seized by the police. Specifically, Appellant contends that, following the conclusion of the initial traffic stop, he was subjected to an illegal investigative detention when Officer Palamara reintroduced questioning after telling Appellant he was free to leave. Appellant contends no reasonable person would have believed he was free to leave the scene.

He also asserts Officer Palamara lacked any reasonable articulable basis to conclude illegal activity had occurred or was occurring at the time he re-engaged Appellant. Therefore, Appellant submits his consent to search the vehicle was involuntary since it was tainted by the second illegal investigative detention, thus requiring the suppression of the evidence seized by the police following the search of Appellant's vehicle.

In reviewing Appellant's suppression claim, we are mindful that:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. Yandamuri*, 639 Pa. 100, 159 A.3d 503, 516 (2017) (citations omitted).

"The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect citizens from unreasonable searches and seizures, including those entailing only a brief detention." *Commonwealth v. Reppert*, 814 A.2d 1196, 1201 (Pa.Super. 2002) (*en banc*) (citation omitted).

> A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies. One such exception is consent, voluntarily given. The central Fourth Amendment inquiries in consent cases entail assessment of the constitutional validity of the citizen/police encounter giving rise to the consent; and, ultimately, the voluntariness of consent. Where the underlying encounter is found to be lawful, voluntariness becomes the exclusive focus.

*Commonwealth v. Strickler*, 563 Pa. 47, 757 A.2d 884, 888-89 (2000) (footnotes and citations omitted).

In the case *sub judice*, the Commonwealth argues that after the police told Appellant he was free to leave the traffic stop was concluded. It maintains that when Officer Palamara re-initiated contact with Appellant, the officer engaged Appellant in a mere encounter that did not need to be supported by reasonable suspicion.

> This Court has noted that there are three basic categories of interactions between citizens and the police. The first category, a mere encounter or request for information, does not need to be supported by any level of suspicion, and does not carry any official compulsion to stop or respond. The

second category, an investigative detention, derives from **Terry v. Ohio** [, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] and its progeny: such a detention is lawful if supported by reasonable suspicion because, although it subjects a suspect to a stop and a period of detention, it does not involve such coercive conditions as to constitute the functional equivalent of an arrest. The final category, the arrest or custodial detention, must be supported by probable cause.

**Commonwealth v. Smith**, 575 Pa. 203, 212–13, 836 A.2d 5, 10 (2003); **see also Florida v. Bostick**, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (citation omitted) ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business,…the encounter is consensual and no reasonable suspicion is required.").

**Commonwealth v. Moyer**, 954 A.2d 659, 663-64 (Pa.Super. 2008) (*en banc*). The level of police-citizen interaction may alter over the course of one incident. For example, what begins as an investigative detention may devolve into a mere encounter. **See Strickler**, **supra**.

In the present case, there is no question that Appellant was subjected to a constitutional seizure when Officer Palamara stopped his vehicle for the lack of valid registration. Therefore, we must decide whether, when Officer Palamara reintroduced questioning after telling Appellant he was free to leave, the subsequent police contact constituted a mere encounter.

In **Strickler**, [**supra**], our Supreme Court analyzed under what circumstances a police interdiction can devolve into a mere encounter following a traffic stop when police continue to question the person after the reason for the traffic stop has concluded. The Supreme Court in **Strickler** ruled that after police finish processing a traffic infraction, the determination of whether a continuing interdiction constitutes a mere encounter or a constitutional seizure centers upon whether an individual would

- 12 -

objectively believe that he was free to end the encounter and refuse a request to answer questions.

Our Supreme Court adopted a totality-of-the-circumstances approach. It delineated a non-exclusive list of factors to be used in making this assessment. Those factors include 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location and time of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including its degree of coerciveness; 8) "the degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless,…thus suggesting to a citizen that his movements may remain subject to police restraint," and 9) whether there was an express admonition to the effect that the citizen-subject is free to depart, which "is a potent, objective factor." Our Supreme Court also observed that when an individual has been subjected to a valid detention but police continue to engage the person in conversation, the person is less likely to reasonably believe that he is actually free to leave the scene.

*Commonwealth v. Kemp*, 961 A.2d 1247, 1253 (Pa.Super. 2008) (*en banc*)

(citations omitted).

Moreover, with regard to the last two factors, *Strickler* observed:

The degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless…thus suggesting to a citizen that his movements may remain subject to police restraint, is a pertinent factor….'[F]ew motorists would feel free…to leave the scene of a traffic stop without being told they might do so.' While recognizing…that the admonition to a motorist that he is free to leave is not a constitutional imperative, the presence or absence of such a clear, identified endpoint to the lawful seizure remains a significant, salient factor in the totality assessment.

*Strickler*, *supra*, 757 A.2d at 898-99.

- 13 -

In the case *sub judice*, the trial court held that the traffic stop devolved into a mere encounter when Officer Palamara told Appellant that he was free to leave. Specifically, the trial court indicated:

> First, there was no police excesses. The [evidence] offered at the suppression hearing showed only one officer arriving at the scene. There was no apparent physical contact between [Appellant] and Officer Palamara. The only time that Officer Palamara arguably directed [Appellant's] movements was when he first pulled [Appellant] over and directed him to remain in his vehicle. [Appellant] was pulled over in a laundromat parking lot in the middle of the day with people/cars seen coming and leaving the laundromat. Officer Palamara testified that he had a conversational tone with [Appellant] and the interaction was conducted in a cordial manner. [There was no evidence] of furtive movements by either [Appellant] or Officer Palamara. After several minutes, Officer Palamara informed [Appellant], who was not able to drive from the scene, that he was free to leave his car parked at the laundromat and arrange for someone to come pick up his vehicle. Despite the presence of a few, limited elements that might be considered official compulsion, we conclude, based on the time and location of the stop, the Officer's cordial, conversational manner, the absence of physical force threatened or used, Officer Palamara's admonition to [Appellant] that he was free to leave,…weigh in favor of a determination that Officer Palamara's subsequent questioning of [Appellant] after telling [him] he was free to go constituted a mere encounter.

Trial Court Opinion, filed 1/11/21, at 8-9.

We agree with the trial court's sound reasoning. Moreover, we note that, after the officer informed Appellant he was free to leave, Appellant and the officers began walking away from Appellant's vehicle. Appellant admits that, at this point, he believed he was "absolutely" done talking to the police. When Officer Palamara called out to him, he changed his course and went back to speak to the officer.

- 14 -

Thus, under the totality of the circumstances, we agree with the trial court that, after Officer Palamara told Appellant he was free to leave, the encounter devolved into a mere encounter. *Commonwealth v. Randolph*, 151 A.3d 170, 177–78 (Pa.Super. 2016) (holding valid traffic stop devolved into a mere encounter where the officer told the defendant he was free to leave, traffic stop occurred in mid-morning, the officer did not utilize the sirens, the initial investigative detention was not coercive, the interaction was calm, the defendant's movements were minimally directed, and it was only after the officer told the defendant that he was free to leave and both were headed toward their vehicles that the officer again spoke to the defendant).

Accordingly, contrary to Appellant's assertion, Officer Palamara did not require reasonable suspicion during this encounter, and the trial court did not err in denying Appellant's suppression motion.[5] *See Moyer*, *supra*.

In his final issue, Appellant contends the trial court erred in denying his motion for a mistrial after Officer Palamara made a statement on direct examination implying that Appellant was involved in prior criminal activity. Appellant contends the officer's testimony violated the trial court's pre-trial ruling and was otherwise unduly prejudicial.

---

[5] We note that, aside from challenging the lawfulness of the encounter, Appellant does not contend on appeal that his consent was otherwise involuntary. *See Strickler*, *supra*.

At the commencement of Appellant's jury trial, defense counsel made an oral motion seeking to preclude any reference to Appellant being on state parole. N.T., 8/17/20, at 5. The trial court granted the motion. *Id.*

Thereafter, during the direct examination of Officer Palamara by the assistant district attorney ("ADA"), the following relevant exchange occurred:

> [ADA]: Did you have a conversation with him….It looks like you're talking to him while he's laying his head on the car. Do you know what's going on at this point?
>
> [THE OFFICER]: I really don't recall specifically. I just remember we were—that was during that conversation.
>
> [ADA]: Did you have a conversation about whether or not he was going to be charged?
>
> [THE OFFICER]: Yes, at some point we did. He was—he was begging me—like, after he explained that situation, he was begging me, you know, please don't charge me, I'll go back to jail, I don't want to go to jail, please, you know, is there anything you can do? You know, please—you know. And I kept talking to him, and at some point, I ended up informing him that he was gonna get charged with that.
>
> [ADA]: Okay. And you said that the—
>
> [DEFENSE COUNSEL]: Your Honor, I'm sorry. Can I object really quickly? Can we approach?
>
> THE COURT: Your indulgence, ladies and gentlemen.

*Id.* at 62. Defense counsel specifically requested a mistrial, which the trial court denied. *Id.* at 77.

The standard of review for determining whether the trial court erred in denying a motion for a mistrial is as follows:

> The trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury, and as such, the grant or denial of a mistrial will not be overturned absent an abuse of discretion. A mistrial may be granted only where the incident

upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict.

*Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997, 1016 (2007) (quotation omitted).

This Court has held:

With respect to evidence of other criminal activities of a defendant which have no relation to his current charges, the general rule is that the Commonwealth may not introduce such evidence. However, the Pennsylvania Supreme Court has stated, "[W]e have never ascribed to the view that all improper references to prior criminal activities necessarily require the award of a new trial." *Commonwealth v. Richardson*, 496 Pa. 521, 526, 437 A.2d 1162, 1165 (1981). Thus, there is no "per se" rule requiring a new trial for every reference of this type. Rather, the decision whether to declare a mistrial when faced with this situation is within the sound discretion of the trial judge. "The nature of the reference and whether the remark was intentionally elicited by the Commonwealth are considerations relevant to the determination of whether a mistrial is required*."* When the court "is convinced beyond a reasonable doubt that the error did not contribute to the verdict, we may hold that reversal is not required because the error was harmless." Further, "[m]ere 'passing references' to prior criminal activity do not warrant reversal unless the record illustrates that prejudice resulted from the references."

*Commonwealth v. Valerio*, 712 A.2d 301, 303 (Pa.Super. 1998) (citations and quotations omitted). *See Commonwealth v. Parker*, 957 A.2d 311, 319 (Pa.Super. 2008) ("A singular, passing reference to prior criminal activity is usually not sufficient to show that the trial court abused its discretion in denying the defendant's motion for a mistrial."). Further, another relevant factor is whether the Commonwealth attempted to exploit the information. *Valerio*, *supra*.

Here, in explaining the reasons it denied Appellant's motion for a mistrial, the trial court indicated the following:

> Although the reference to Appellant's prior criminal history (that the Appellant did not want to go back to jail) was made in response to a question by the Commonwealth, the record does not indicate that the reference was deliberately elicited to establish Appellant's prior record. The Officer's comment was a singular reference to Appellant's criminal history and did not reference any specific crime. Further, the Commonwealth did not thereafter attempt to exploit the single reference to highlight Appellant's history….The statement was said very quickly and then the Commonwealth proceeded on to another matter. Thus, under the circumstances of this case, a mistrial was unwarranted.

Trial Court Opinion, filed 1/11/21, at 11.[6]

The trial court's reasoning is sound, and we conclude the trial court did not abuse its discretion in denying Appellant's motion for a mistrial. ***See Valerio***, ***supra***.

For all of the aforementioned reasons, we affirm.

Affirmed.

---

[6] We note that whether the trial court gave an appropriate cautionary instruction is another factor to consider in whether Appellant was unduly prejudiced by a reference to his prior criminal activity. ***See Parker***, ***supra***. However, Appellant specifically indicated he did not want the trial court to give a cautionary instruction, and thus, the trial court did not give a cautionary instruction. N.T., 8/17/20, at 77-78.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/05/2021</u>