J-S40011-17

2017 PA Super 231

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JOHN ANTONIO CRUZ :
:
Appellant : No. 2482 EDA 2016

Appeal from the Judgment of Sentence July 19, 2016
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0000702-2015

BEFORE: OTT, DUBOW, JJ., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED JULY 18, 2017**

Appellant, John Antonio Cruz, appeals from the judgment of sentence entered in the Court of Common Pleas of Lehigh County following his conviction by a jury on the charges of receiving stolen property, terroristic threats, and simple assault, as well as his conviction by the trial court on the charge of person not to possess a firearm.[1] Appellant's sole claim on appeal is that the suppression court erred in denying his motion to suppress the

---

[1] 18 Pa.C.S.A. §§ 3925(a), 2706(a)(1), 2701(a)(3), and 6105(a)(1), respectively.

[*] Former Justice specially assigned to the Superior Court.

handgun seized by the police during the warrantless search of a bathroom located in a barber shop where Appellant was employed.  We affirm.

The relevant facts and procedural history are as follows: Appellant was arrested, and on June 22, 2015, he filed a counseled pre-trial motion seeking to suppress the handgun seized by the police during the warrantless search of a barber shop bathroom. Specifically, Appellant contended the police did not have probable cause for the search, there were no exigent circumstances, and the search was not a routine administrative inspection of the business.

On October 20, 2015, the matter proceeded to a suppression hearing at which the Commonwealth argued Appellant did not have a legitimate, reasonable expectation of privacy in the area from which the evidence was seized.  Appellant testified on his own behalf, and the Commonwealth presented the testimony of Police Officer Dale Stokes, Police Officer John Hill, and Sergeant Matt Karnish.

Specifically, Appellant testified that, on February 4, 2015, he was the manager of the Sports Cuts Barber Shop ("Sports Cuts"), which was located on Union Boulevard in Allentown and owned by Ruben Rodriguez.  N.T., 10/20/15, at 7-8.  Appellant described Sports Cuts as a "very large[,]" busy shop with two entrances, a smoke room, a lounge, a storage room, and a garage.  *Id.* at 9.  He testified that, on the left side in the rear of the lounge, there was an office, which was restricted to employees only.  *Id.* at 10.

Appellant further testified that, in an L-shaped hallway, Sports Cuts had two separate single occupancy bathrooms, both of which were open to the public.[2] *Id.* at 10-11, 17.

Police Officer Dale Stokes testified that, on February 4, 2015, at 4:17 p.m., he received a radio call to respond to a barber shop located on Hanover Avenue in Allentown, the Royal Cuts Barber Shop ("Royal Cuts"),[3] for threats involving a handgun. *Id.* at 26, 33. Upon arrival at 4:22 p.m., David Purcell, who was an employee of Royal Cuts, informed Officer Stokes that he had been sitting in a chair at Royal Cuts with a hot towel over his face when he felt an item being pressed against his forehead. *Id.* at 27, 33. When Mr. Purcell removed the towel, he discovered Appellant, a person with whom he used to work at Sports Cuts, pressing a handgun to his forehead.[4] *Id.* at 27-28.

_____

[2] Appellant described the bathrooms as two separate bathrooms which were single occupancy, each with their own separate door and lock. *Id.* at 11. A wall, which was made out of "typical drywall," separated the two bathrooms, and similar to the rest of the barber shop, the bathrooms had drop ceilings. *Id.* at 81-82. The bathrooms did not contain stalls for multiple users.

[3] Royal Cuts on Hanover Avenue is located a few blocks away from Sports Cuts on Union Boulevard. *Id.* at 26, 28.

[4] The record reveals that Mr. Purcell had been a barber at Sports Cuts and worked with Appellant. However, on January 1, 2015, Mr. Purcell left his employment with Sports Cuts and began working for Royal Cuts. When Mr. Purcell left Sports Cuts, he mistakenly took a pair of Appellant's clippers, which led to Appellant confronting Mr. Purcell and threatening him at Royal Cuts on February 4, 2015.

Officer Stokes indicated that, in response to the information provided to him by Mr. Purcell, he radioed for back-up, and several uniformed officers joined Officer Stokes and his partner, both of whom were in uniform, at a Sunoco gas station, which was "[a] couple [of] blocks" from Royal Cuts. *Id.* at 28, 34, 39. From there, the police went to Sports Cuts with the intent of finding Appellant; they arrived at Sports Cuts at 4:57 p.m. *Id.* at 28, 34, 40. The officers surrounded the building with a group of officers entering through the front unlocked door. *Id.* at 29. Officer Stokes testified no one told them to leave, and there were customers in the shop. *Id.* While some officers proceeded to the hallway where the bathrooms were located, Officer Stokes proceeded to the back of Sports Cuts, where someone sitting on a sofa told him that no one else was in the back of the shop. *Id.* Officer Stokes then proceeded to the hallway and observed Sergeant Karnish knocking on one of the bathroom's doors. *Id.* at 30.

Sergeant Karnish asked the occupant to come out of the bathroom, and a male voice indicated he would be "out in a moment." *Id.* at 31. Officer Stokes heard "rustling inside the bathroom," a couple of flushes of the toilet, and then a loud "thump" coming from the ceiling tiles[5] of the hallway and bathroom area, resulting in Officer Hill, who was standing at the end of the hallway, becoming startled. *Id.* at 31, 47. Eventually, the male,

_____

[5] Officer Stokes described the ceiling as a "drop ceiling" made out of a light-weight, fiber-type material. *Id.* at 47.

later identified as Appellant, exited the bathroom of his own volition, and Officer Stokes handcuffed him. *Id.* at 32. Officer Stokes testified that he looked into the bathroom and observed that one of the ceiling tiles was "off the tracks and hanging down." *Id.* at 49. He admitted that the police did not secure a warrant prior to entering Sports Cuts. *Id.* at 32, 36, 49.

Police Officer John Hill confirmed that he met Officer Stokes and other uniformed officers at the Sunoco gas station. *Id.* at 58. He clarified that, upon arrival at Sports Cuts, two officers entered Sports Cuts through the unlocked front door, while he and another officer entered through an unlocked side door. *Id.* at 58, 64. The police "looked around throughout the business" in an attempt to locate Appellant, and during the search, Officer Hill discovered one of the bathrooms was occupied with the door locked. *Id.* at 59. He could hear someone moving around inside of the bathroom, and he confirmed that Sergeant Karnish knocked on the door, to which the person inside replied for him "to hold on." *Id.*

Officer Hill testified that, while the police waited for the person inside of the bathroom to exit, he "started hearing movement in the ceiling tiles above [him]." *Id.* at 60. Following the sound of the noise, he went into the separate unoccupied bathroom, and within ten seconds, Officer Hill heard "a loud clunk and the ceiling tiles right above [his] head dropped about an inch." *Id.* Officer Hill testified that, without standing on anything, he "put [his] hand on the tile to see what it was that was coming through. And as

- 5 -

soon as [he] put even the lightest touch on th[e] tile the gun fell out[,]" landing on either the toilet or floor. *Id.* Appellant then exited the occupied bathroom. *Id.*

Sergeant Matt Karnish testified that he entered Sports Cuts via the front door and the shop was "clearly open for business." *Id.* at 80. He indicated that barbers were performing haircuts on customers, and other customers were waiting in the lounge area. *Id.* Sergeant Karnish spoke to one of the employees in the front, who advised him that Appellant was in the rear portion of the building. *Id.* at 80, 93. Sergeant Karnish "and other officers went through the building and [they] located a locked bathroom door[.]" *Id.* at 80. Sergeant Karnish confirmed that he knocked on the bathroom door and had "limited verbal interaction [with Appellant] with the door being closed." *Id.* at 80, 87.

While Sergeant Karnish waited for Appellant to exit the bathroom, he "could hear a loud thud" coming from above his head in the ceiling. *Id.* at 81-82. He then "heard a loud metallic thud" and observed as the handgun fell through the drop ceiling in the separate unoccupied bathroom. *Id.* at 83. He clarified that he observed Officer Hill put his hand up in an attempt to hold the tile to prevent the handgun, which was pushing through the tile, from falling and potentially discharging. *Id.* at 101.

Sergeant Karnish testified that, shortly after the handgun fell out of the ceiling and Appellant was handcuffed, Mr. Rodriguez, who identified

himself as the owner of Sports Cuts, arrived on the premises.[6] *Id.* at 84-85, 103. Sergeant Karnish indicated that, although the premises was "a public place open for business[,]...[he] wanted to be cautious on how [he] did things[.]" *Id.* at 84. Accordingly, Sergeant Karnish asked Mr. Rodriguez for consent to search the two bathrooms, including seizing the handgun which was lying on the bathroom floor, and Mr. Rodriguez agreed. *Id.* at 84-85, 103-04.

Appellant re-took the stand, and he testified that, on the day of the incident, Mr. Rodriguez was on the premises in the morning; however, he left the premises with Appellant "in charge of the establishment." *Id.* at 108. Appellant testified that he arrived at Sports Cut at 7:00 a.m., where he remained until he left for lunch at 1:30 p.m. *Id.* at 114. He returned from lunch at 2:30 p.m. and remained at the shop until the police arrested him. *Id.* Appellant testified that, except for his lunch break, he was not permitted to leave Sports Cuts. *Id.*

Appellant confirmed that he was using the bathroom when the police began knocking on the bathroom's door. *Id.* at 110. Appellant testified that he had just started to use the bathroom when the police arrived and it took a few minutes for him to finish. *Id.* at 112. Appellant explained that the

---

[6] Mr. Rodriguez was able to view the interior of Sports Cuts on his cell phone via the shop's security system, and, thus, when he observed the police's arrival, he came to Sports Cuts. *Id.* at 21.

"rustling" noise the police heard was him removing toilet paper from the dispenser. *Id.* at 110. Appellant indicated that he exited the bathroom, and the police immediately handcuffed him. *Id.* at 112. Appellant testified that he had no weapons, and he learned about the discovery of a handgun for the first time after one of the officers detained him. *Id.* at 113. Appellant denied hearing any loud "thud" noise while he was in the bathroom. *Id.* at 116.

By order and opinion entered on October 26, 2015, the trial court denied Appellant's pre-trial suppression motion on the basis that Appellant failed to prove he had a legitimate, reasonable expectation of privacy in the unoccupied bathroom, which was opened to the public, from which the handgun was seized.[7] Appellant proceeded to a jury trial, at which he was convicted of receiving stolen property, terroristic threats, and simple assault. On that same date, the trial court convicted Appellant of person not to possess a firearm. On July 19, 2016, the trial court sentenced Appellant to an aggregate of thirteen and one half years to twenty-seven years in prison, and this timely appeal followed. All Pa.R.A.P. 1925 requirements have been met.

_____

[7] Additionally, the trial court held the police had probable cause to make a warrantless arrest of Appellant, the police obtained valid consent to search the premises, and the police did not otherwise conduct an unlawful search of the premises. *See* Trial Court Opinion, filed 10/26/15.

On appeal, Appellant contends that the suppression court erred in denying his pre-trial motion to suppress the handgun seized by the police. Appellant initially specifically contends that, as the manager of Sports Cuts, he had a legitimate, reasonable expectation of privacy in the bathrooms at issue such that the warrantless search thereof offended his constitutional rights.

Our standard of review of a lower court's order denying a defendant/appellant's motion to suppress evidence is well established:

> [The] standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing such a ruling by the suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record....Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Eichinger*, 591 Pa. 1, 22, 915 A.2d 1122, 1134 (2007) (citations omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Gallagher*, 896 A.2d 583, 585 (Pa.Super. 2006) (quotation marks and quotation omitted). Moreover, we note that our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *In re L.J.*, 622 Pa. 126, 79 A.3d 1073 (2013).

> The Fourth Amendment protects: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; Pa. Const. art. 1, § 8. The protection of the Fourth Amendment does not depend on a property right in the invaded place but does depend on whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.

*Commonwealth v. Brundidge*, 533 Pa. 167, 172-73, 620 A.2d 1115, 1118 (1993) (citation omitted).

Although Appellant was charged with a possessory offense, and as such has automatic standing to challenge the suppression of the handgun seized by the police, it was appropriate for the suppression court to initially examine the question of whether Appellant demonstrated a reasonable expectation of privacy. *See Commonwealth v. Enimpah*, 630 Pa. 357, 106 A.3d 695 (2014). It is well-settled that:

> An expectation of privacy will be found to exist when the individual exhibits an actual or subjective expectation of privacy and that expectation is one that society is prepared to recognize as reasonable. In determining whether a person's expectation of privacy is legitimate or reasonable, the totality of the circumstances must be considered and the determination will ultimately rest upon a balancing of the societal interests involved. "The constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on whether the expectation is reasonable in light of all the surrounding circumstances."

*Commonwealth v. Viall*, 890 A.2d 419, 422 (Pa.Super. 2005) (citations and quotation omitted). Further, our Supreme Court has emphasized that it is a *defendant's* burden to prove that he has both a subjective expectation of privacy and that the subjective expectation is one which society is willing to

respect as legitimate. *Commonwealth v. Millner*, 585 Pa. 237, 888 A.2d 680 (2005).

In developing his specific appellate argument, Appellant avers the following:

> It is true that [Appellant] and the firearm in question were found inside the premises used as a barber shop and that the shop was open to the public. However, the specific area searched was [one of the] bathrooms and not the general public area used by the patrons and the general public. [Appellant] was also more than just an employee but he was the manager of the store and carried with that position his control over the premises including the opening and closing of business, as well as the maintenance of the premises during the business hours....[Appellant] was more than a casual visitor but was in fact one of the individuals with authority over the premises. Additionally, he was in an area that is clearly one that is highly personal and private for most individuals. He was not in the front area of the store where patrons would come and go but rather he was in a separate hallway and in an area designed for privacy. This was not a bathroom in a separate location for which [Appellant] had no responsibility but was rather one that was in his long time place of employment. [Appellant] had secured and locked the door and, based on his own testimony in the [s]uppression [h]earing, was using the facilities in an emergency situation. He sought to preserve that privacy until he was finished [with] his business by which time the officer had already engaged in touching the ceiling panels in the adjacent [separate] bathroom, dislodging it, and discovering the gun on top of the panel. [Appellant] believes that he exhibited a subjective expectation of privacy and that his expectation is one that society should be prepared to recognize as reasonable and legitimate. A bathroom, even in a public facility, is still a place of privacy and secrecy.

Appellant's Brief at 17-18.

Appellate courts have held that employees have a reasonable expectation of privacy in certain areas of their workplace. *See City of*

*Ontario v. Quon*, 560 U.S. 746, 130 S.Ct. 2619 (2010) (recognizing there is a heightened level of privacy in the workplace); *O'Connor v. Ortega*, 480 U.S. 709, 718–19, 107 S.Ct. 1492, 1498 (1987) ("As with the expectation of privacy in one's home, [an expectation of privacy] in one's place of business is 'based upon societal expectations that have deep roots in the [Fourth] Amendment.'") (quotation omitted)); *Commonwealth v. Jackson*, 809 A.2d 411 (Pa.Super. 2002) (holding search of postmaster's private office was unconstitutional). Moreover, this Court has recognized that occupants of bathrooms have a reasonable expectation of privacy in the bathroom, even if the bathroom is located in a public place. *Commonwealth v. Demchak*, 380 A.2d 473 (Pa.Super. 1977) (*en banc*) (holding the appellant had a justifiable expectation of privacy when he entered a restroom at a gas station and that expectation was unreasonably violated so as to require suppression of evidence obtained as a result of police officer climbing onto a shed and peering into the restroom without probable cause); *Commonwealth v. Soychak*, 289 A.2d 119 (Pa.Super. 1972) (holding that patrons in a club's bathroom had a reasonable expectation of privacy such that the police's peering through louvers on exhaust fan violated that expectation).

However, "[t]he reasonableness of one's expectations will necessarily turn on the facts in the individual case evincing the strength of that belief and the measures taken to ensure privacy." *Commonwealth v. Black*, 530

A.2d 423, 426 (Pa.Super. 1987) (quotation marks and quotation omitted). That is, "the question of whether an employee[, as with any individual], has a reasonable expectation of privacy must be addressed on a case-by-case basis." *City of Ontario*, 560 U.S. at 756-57, 130 S.Ct. at 2628 (quotation marks and quotation omitted).

"It is now well established that a person cannot have a reasonable or justifiable expectation of privacy in things or activities which are generally visible from some public vantage point." *Commonwealth v. Lemanski*, 529 A.2d 1085, 1091 (Pa.Super. 1987) (citation omitted). In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507 (1967), the United States Supreme Court recognized the now familiar principle that:

> the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Id.* at 351-52, 88 S.Ct. at 511-12.

In the case *sub judice*, as the suppression court determined, the police officers entered Sports Cuts, a barber shop open to the public, during normal business hours with several patrons and employees in the shop. The officers testified that Sports Cuts' doors through which they entered were unlocked and no one asked them to leave. The officers proceeded to the area where Sports Cuts' two separate single occupancy bathrooms were located; Appellant admitted at the suppression hearing that this area and, more

precisely, the bathrooms, were open to the public. *See* N.T., 10/20/15, at 10-11, 17.

Contrary to any suggestion by Appellant on appeal, the record does not support the finding that the police entered, peered into, or otherwise invaded Appellant's privacy while he was utilizing one of the bathrooms. Rather, as a police officer knocked on the door of the bathroom waiting for its occupant (Appellant) to exit, another police officer stood in the adjoining, separate, unoccupied public bathroom, at which point a handgun, which the suppression court determined was thrown by Appellant, dislodged a ceiling tile and, ultimately, fell to the ground as the officer put his hand up to the ceiling.

Since the officer viewed the handgun from a place otherwise open to the public, and as a result of Appellant's own action which caused the handgun to dislodge the ceiling tiles, we agree with the suppression court that Appellant "failed to establish a subjective expectation of privacy..., much less one that society would accept as reasonable, such that the warrantless police entry implicated his own personal privacy rights."[8] *Millner*, *supra*.

_____

[8] We further note that "[i]t is axiomatic that a defendant has no standing to contest the search and seizure of items which he has voluntarily abandoned." *Commonwealth v. Byrd*, 987 A.2d 786, 790 (Pa.Super. 2009) (citation omitted). This Court has held:
*(Footnote Continued Next Page)*

Accordingly, for all of the aforementioned reasons, we affirm.[9]

Affirmed.

*(Footnote Continued)* ─────────

Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged abandonment should be considered. The issue is not abandonment in the strict property-right sense but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.

**Commonwealth v. Barnette**, 760 A.2d 1166, 1170-71 (Pa.Super. 2000) (emphasis omitted) (quotation omitted).

In the case *sub judice*, the suppression court found that, upon discovering the police were knocking on the bathroom door, Appellant attempted to discard the firearm by throwing it into the ceiling, thus evidencing an intent to relinquish control over the firearm. **See** Trial Court Opinion, 10/26/15, at 8. We agree. Accordingly, Appellant has failed to demonstrate that he had a reasonable expectation of privacy as to the handgun or a legally cognizable expectation of privacy in the area (the unoccupied public bathroom in Sports Cuts) from which the handgun was seized. **Byrd**, **supra**.

[9] In light of our conclusion that Appellant failed to demonstrate a reasonable expectation of privacy, we need not address his remaining suppression claims. **See Enimpah**, 630 Pa. at 368, 106 A.3d at 702 ("[I]f the evidence shows there was no privacy interest, the Commonwealth need prove no more; in terms of the court's review, it need go no further if it finds the defendant has not proven a reasonable expectation of privacy.").

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/18/2017