J-A17016-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| ERNEST WILLIAMS, | |
| Appellant. | No. 1569 WDA 2016 |

Appeal from the Judgment of Sentence, July 5, 2016,
in the Court of Common Pleas of Allegheny County,
Criminal Division at No(s): CP-02-CR-0016085-2013.

BEFORE:   OTT, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY KUNSELMAN, J.:                    FILED AUGUST 28, 2018

Ernest Williams appeals from his judgment of sentence.  Because the suppression judge violated the Pennsylvania Rules of Criminal Procedure, we must remand for a new suppression hearing and, if necessary, a new trial.

## Factual Background

At around 7:00 AM, on a cold, November 2013 morning, the Allegheny County Police arrested Ernest Williams without a warrant.  They suspected him of involvement in Jeremy Fields' death.

Three-and-half hours earlier, two Munhall police officers had received a report of "shots fired."  They jumped in their squad car and headed for the scene.  Headlights appeared in the opposing lane of traffic and moved towards them at a high rate of speed.  The police turned their cruiser

around, pursued, and observed the vehicle run a stop sign. The officers pulled it over.

The car turned out to be a black Ford Five Hundred, with a unique, ragtop roof and a gray, metallic stripe on its sides. Williams, the driver, was alone in his car. Despite the temperature being 30 degrees that morning, he was perspiring. The police also described him as nervous.

When the officers asked Williams his travel plans, his explanation did not jive with Munhall's geography. Thus, the officers inferred that he was lying. But he consented to a vehicle search, which uncovered no evidence of a crime, so they let him go.

The police then continued on their way to investigate the shooting. They found Mr. Fields' corpse laying face up in the road, with multiple bullet wounds and a trail of blood running into the gutter.

Investigators noticed a security camera on Hruska Plumbing, a local business, pointing right at the body. The officers, hoping that surveillance video had captured the murder, contacted Hruska's owner and asked to view his security footage. The owner agreed and took them into his office, where he played two recordings from his outdoor cameras.

According to the officer's suppression-hearing testimony, one camera recorded the killing. And, while it did not show Williams' face, the police testified that they saw the image of a black sedan stop in front of Hruska Plumbing. According to the officers, both a ragtop roof and a gray, metallic stripe on the side of the sedan were clearly visible on the video. In their

opinions, the roof and the stripe on screen matched those on Williams' Ford Five Hundred. An officer specifically identified the car in the video as the "black sedan I stopped with Ernie Williams in it." N.T., 5/19/14, at 35.

So Allegheny County Police alerted all personnel to "be on the lookout for that vehicle." Id. at 43. As fate would have it, when a detective left the scene around 7:00 AM, he spotted a Ford Five Hundred matching that exact description coming in the opposite direction. The detective made a U-turn and confirmed from the license plate that the car was Williams' automobile. The detective and another marked car stopped Williams and arrested him.

Police then towed his Ford Five Hundred to their headquarters, where the Allegheny County Medical Examiner's Office recovered DNA evidence from the car's exterior. The police also interrogated Williams for most of the day without giving him his constitutionally required warnings under Miranda v. Arizona, 384 U.S. 436 (1966). From their interrogation, the police learned where to secure additional video evidence against Williams. That new video evidence revealed that Williams had been with Mr. Fields for several hours prior to the murder.

Williams moved to suppress all of the Commonwealth's post-arrest evidence on the grounds that his warrantless arrest was unconstitutional and that all of the evidence uncovered thereafter was fruit of a poisoned tree. In his motion to suppress, Williams' attorney clearly stated that he was "unable to open the Hruska video . . . Although the District Attorney's Office has

agreed to provide a viewable CD, that has not occurred as of the filing of this motion." Williams' Omnibus Pretrial Motion, 4/4/14, at 5.

The Commonwealth never moved to admit the Hruska Plumbing video into evidence at the suppression hearing. Instead, it rested upon the police officers' testimony of what they recalled from the video.

After two days of testimony, Court of Common Pleas Judge Randal B. Todd partially denied the motion and partially granted it. He suppressed all of Williams' pre-Miranda statements, but the judge declined to suppress any of the Commonwealth's physical evidence. In the suppression court's judgment, the Commonwealth had probable cause to stop Williams' car at 7:00 AM and to arrest him, on a likelihood that he was involved in Mr. Fields' murder. The judge credited the officers' recollections of what they had seen on the surveillance video, and he believed that they had recognized Williams' Ford Five Hundred in the recordings. Critically, though, Judge Todd had never seen the surveillance video when he made those credibility findings.

According to Williams' attorney, after Judge Todd refused to suppress:

> Assistant District Attorney Summer Carroll [and he] viewed the shooting video in her office. [They agreed] that it does not show that the vehicle in question had a ragtop roof, nor can a viewer determine that it was a Ford Five Hundred. The only thing visible about the car is that it is black and seems to have a stripe on the side.

Williams' Motion for Reconsideration, 11/19/14, at 2.

Judge Todd summarily denied Williams' motion for reconsideration the next day.

The following spring, Williams renewed his motion for reconsideration and, alternatively, asked Judge Todd to reopen the record and admit the video surveillance as a part of the suppression court's evidence. Again, the judge summarily denied the motion without a hearing, on March 31, 2015.

Ten days later, Williams moved for Judge Todd to recuse himself. The judge granted that motion, and Court of Common Pleas of Allegheny County Judge Philip A. Ignelzi assumed jurisdiction.

Williams then asked Judge Ignelzi to admit the surveillance video into evidence. Pointing out that the video itself was the "Best Evidence," Williams argued that the video must be admitted and considered to disprove that the police had probable cause to arrest him. The Commonwealth argued that, under the coordinate jurisdiction rule, Judge Ignelzi could not overrule another common pleas judge's denial of suppression, even if he disagreed with it. Thus, the Commonwealth contended that Judge Todd's denial of suppression constituted law of the case, which bound Judge Ignelzi.

In preparation for an oral argument on Williams' motion, Judge Ignelzi reviewed the surveillance video in camera. After in camera review, Judge Ignelzi found that the coordinate jurisdiction rule and the doctrine of the law of the case barred him from reconsidering the denial of suppression.

The case then proceeded to a jury trial.

The jury convicted Williams of murder of the first degree[1] and carrying a firearm without a license.[2] Judge Ignelzi sentenced him to life without the possibility of parole, and this appeal followed.

### Analysis

Williams raises three appellate issues. First, he claims Judge Todd's refusal to suppress the Commonwealth's physical evidence was an error of law, because the police arrested him without probable cause. See Williams' Brief at 6. Second, Williams argues that Judge Todd erred "in refusing to grant [his] request to reopen the record so that [Judge Todd] could receive and view the video." Id. Third, Williams says that Judge Ignelzi erred by not dismissing a juror. Id.

We address only issue number two – i.e., whether Judge Todd erred in denying Williams' motion to reopen the suppression record – because our disposition of that question ends this appeal.

The trial court directed Williams to file a statement of alleged errors under Pennsylvania Rule of Appellate Procedure 1925(b). Williams complied, and Judges Todd and Ignelzi jointly authored a detailed 1925(a) Opinion. In it, the judges acknowledged that Judge Todd should have granted Williams' motions to reopen the suppression record. However, they think that Judge

---

[1] 18 Pa.C.S.A. § 2501(A).

[2] 18 Pa.C.S.A. § 6106(A)(1).

Ignelzi rectified that error. "While the suppression court erred in not reopening the record, admitting, and reviewing the shooting video, the error was remedied. The Trial Court, Judge Ignelzi, admitted and viewed the video in ruling upon [Williams'] motion to review and/or reconsider the suppression court's ruling." Trial Court Opinion, 8/9/17, at 29.

When, as here, police have acted without a warrant, "determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." Ornelas v. United States, 517 U.S. 690, 699 (1996). But "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Id.

Because the Commonwealth prevailed at the suppression hearing, we may examine "only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." Commonwealth v. Russo, 934 A.2d 1199, 1203 (Pa. 2007) (internal quotations and citations omitted). As for the subject matter, "our scope of review is limited to the factual findings and legal conclusions of the suppression court." In re L.J., 79 A.3d 1073, 1080 (Pa. 2013). Additionally, citing to L.J., this Court has said "our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing." Commonwealth v. Cruz, 166 A.3d 1249, 1254 (Pa. Super. 2017), appeal denied, 180 A.3d 1207 (Pa. 2018).

Given our narrow scope of review, before we can reach the question of whether police had probable cause when they arrested Williams, we must determine whether the surveillance video became part of the record "at the suppression hearing." Id. If it did not, then we cannot watch it to decide Williams' claim that the police lacked probable cause to arrest him.

At oral argument, we asked both sides if we may review the video and directed them to resolve that issue, if possible, on their own. They could not. See Commonwealth's 7/19/18 Letter to Deputy Prothonotary of the Superior Court at 1.

In light of the parties' inability to reach agreement on whether we may look at Hruska's video, we must adhere to this Court's precedent that "our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing." Cruz, supra. at 1254 (emphasis added). Because Judge Ignelzi only reviewed the video in camera and Judge Todd never watched it "at the suppression hearing," it is not part of the suppression record. Id.

Moreover, Cruz and L.J. make clear that our scope of appellate review of a suppression ruling only encompasses evidence and testimony that the suppression judge considered. Otherwise, we would be importing facts into our review that the suppression judge did not have the benefit of knowing or weighing when making credibility decisions. If we did this, we would remake ourselves into new finders of fact. But our role is only to review the suppression judge's legal conclusions de novo, while taking "care both to

review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas, 517 U.S. at 699. Thus, if we watched the video and used it to second guess Judge Todd's credibility determinations, factual findings, and inferences, we would overstep the bounds of our scope of review. In other words, we would not be giving his factual findings and inferences drawn therefrom there "due weight." Id.

Because we cannot look at the video, Judge Todd's refusal to reopen the record has severally curtailed our appellate review of Williams' primary claim of error. We therefore disagree with the trial court that Judge Ignelzi's in camera review "remedied" any error. Trial Court Opinion, 8/9/17, at 29. Because Judges Todd and Ignelzi agree that the refusal to reopen the record was erroneous, we turn to that issue now. See Id.

Williams asserts that the:

> lynchpin underlying the suppression court's erroneous conclusion that probable cause supported his arrest was Officer Caterino's testimony concerning his observations of a video. The video itself 1) wasn't offered into evidence at the suppression hearing and 2) in fact contradicts Officer Caterino's testimony. Williams informed the court of these facts in his motion to reopen the record, so that the court could receive and view the video. The suppression court erred in refusing to grant the motion.

Williams' Brief at 38.

The Commonwealth responds that, "because . . . Judge Ignelzi viewed the video, held an extensive hearing on the matter and ultimately concluded

that the prior ruling was correct . . . any previous error was addressed and corrected." Commonwealth's Brief at 23. Under the Commonwealth's theory Judge Todd's "error . . . is therefore moot." Id. The Commonwealth sites no authority to support its illogical and novel application of the mootness doctrine.

If at any stage of the judicial process, a case becomes moot, it will be dismissed; moreover, courts in Pennsylvania, generally speaking, do not decide moot issues. See In re Gross, 382 A.2d 116 (Pa. 1978). The mootness doctrine requires that "an actual case or controversy must exist at all stages of review . . . ." Id. at 119. If changes in facts make it impossible for the court to grant the relief sought, the court will dismiss the case or issue as moot. See J.S. and C.S. v. Whetzel, 860 A.2d 1112 (Pa. Super. 2004). The doctrine ensures that the adjudications we hand down truly resolve cases or controversies, instead of being only advisory opinions.

Because our scope of review is limited to the evidence and testimony that Judge Todd considered, and because we have already concluded that Judge Ignelzi did not remedy the harm that Judge Todd's error caused, Williams' second issue cannot be moot. Once Judge Todd recused himself without seeing the video, the damage was done. Nothing Judge Ignelzi did thereafter, short of ordering a de novo suppression hearing, could fix it.

Also, Judge Ignelzi acknowledged that harm had befallen Williams:

> there is no evidence of record that [Judge Todd] reviewed the [video].

> Now, obviously that creates a little bit of a dilemma, because no matter how you dice it, it seems to me [Judge Todd had] to review that [video]

> *       *       *       *

> It seems to me that . . . if this case were to go forward and if Mr. Williams were to be convicted, the chances of this being sustained either on direct appeal or, more importantly, I think, on a Post-Conviction Relief Act motion, are anywhere between slim and none.

N.T., 9/2/15, at 5, 7.

Applying the coordinate jurisdiction rule and doctrine of the law of the case, however, Judge Ignelzi concluded that he could not remedy the harm he had perceived. The coordinate jurisdiction rule generally prohibits judges sitting in the same case, at the same level of our court system, from altering the decisions that their colleagues have previously made. See Commonwealth v. Starr, 664 A.2d 1326, 1331 (Pa. 1995).[3] A corollary to the coordinate jurisdiction rule is the doctrine of the law of the case. That doctrine "refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the

_____

[3] That said, a judge may depart from the previous decision of a judge of coordinate jurisdiction if there is (1) an intervening change in the controlling law, (2) a substantial change in the facts of the disputed matter, or (3) the prior holding is clearly erroneous and, if followed, that holding would create a manifest injustice. Zane v. Friends Hosp., 836 A.2d 25, 29 (Pa. 2003). Alternatively, a new judge could ask the parties to waive application of the coordinate jurisdiction rule. Clearly, that did not occur here, because the Commonwealth was insistent that the rule applied.

earlier phases of the matter." Commonwealth v. Starr, 541 Pa. 564, 574, 664 A.2d 1326, 1331 (1995).

As this Court holds superior jurisdiction to Judge Todd, neither the coordinate jurisdiction rule nor the doctrine of the law of case apply here.[4] Thus, we may grant Williams' prayer for relief and award him a de novo suppression hearing, even if Judge Ignelzi could not. Hence, we conclude that a case and controversy over this issue remains, and the issue of Judge Todd's error is not moot. We therefore may reach the merits of Williams'

_____

[4] We also remind trial judges that they possess a workaround the coordinate jurisdiction rule and law-of-the-case doctrine, even if one party insists upon their application – namely, reargument before the court of common pleas en banc. See Pennsylvania Rule of Criminal Procedure 720 Comment (allowing for argument before a court en banc); Pennsylvania Rule of Civil Procedure 227.2 (accord). Although rarely used in modern practice, the bench and bar should not overlook this tool when, as here, a new judge inherits a case from a colleague but severally doubts the correctness of a prior ruling.

Whenever the court of common pleas sits en banc, it "has the power to reverse prior erroneous rulings." Commonwealth v. Burchard, 503 A.2d 936, 942 (Pa. Super. 1986). It "sits as a 'higher tribunal' than a trial court, and may be more accurately characterized as a quasi-appellate court. Its function is to review the rulings of the suppression hearing judge and the trial judge and to serve as the initial step in the appellate review of trial proceedings." Id. (citations and some punctuation omitted). As a "quasi-appellate court," the recused judge's ruling is not law of the case before the court en banc, nor does it sit in a coordinate jurisdiction. Thus, if a trial judge ever thinks a colleague erred, as Judge Ignelzi did here, (e.g., if "the chances of this being sustained either on direct appeal or . . . on a Post-Conviction Relief Act motion are anywhere between slim and none," N.T., 9/2/15, at 7), convening the court of common pleas en banc could quickly and easily solve the problem.

claim that Judge Todd erred in refusing to reopen the suppression record and failing to view the surveillance video.

A defendant's motion to reopen the suppression record is governed under Pennsylvania Rule of Criminal Procedure 581. "To the extent that this case presents an issue of interpretation of the relevant rules of criminal procedure, our standard of review is de novo, and our scope of review is plenary." Commonwealth v. Libengood, 152 A.3d 1057, 1059 (Pa. Super. 2016), appeal denied, 169 A.3d 1045 (Pa. 2017).

Rule 581(J) dictates that, when a suppression "court determines that the evidence shall not be suppressed, such determination shall be final . . . except upon a showing of evidence which was theretofore unavailable . . . ." Pa.R.Crim.P. 581(J). "[T]he order of the judge determining admissibility is to be final and binding at trial, absent newly discovered and hitherto undiscoverable evidence." Pa.R.Crim.P. 581(J), Comment. The question, then, is whether Williams' counsel made a showing that the digital recording on the CD was "unavailable" to him when Judge Todd originally denied the suppression motion.

Our review of the record indicates that Williams' attorney made clear in his original suppression motion that the digital evidence on the CD was, for all intents and purposes, "unavailable" and "undiscoverable" prior to and during the suppression phase. Williams' motion to suppress clearly informed Judge Todd that "counsel was unable to open the Hruska video." Williams'

Omnibus Pretrial Motion, 4/4/14, at 5.  Counsel also made this clear in the two motions for reconsideration that he filed with Judge Todd.

He repeated this same contention to Judge Ignelzi:

> 7.     Sometime after the court denied [Williams'] motion, counsel for [Williams] met with [ADA] Summer Carroll . . . During this meeting ADA Carroll was able to open the video, and she and counsel viewed the video. After viewing the video, it was clear to counsel for [Williams] and ADA Carroll that it was not possible to determine if the car in question was black, because the video is in black and white and further that it was not possible to determine if that vehicle had a ragtop/landau roof.
>
> 8.     The after-discovered video is contrary to the testimony of [Detectives] Caterino and Mayer, and, if the fact finder viewed the video, the court's previous finding of probable cause would be incorrect.

Williams' Memorandum of Law, 6/26/15, at 3-4.

Thus, in all his motions, defense counsel was consistent in claiming that he could not get the Commonwealth-provided CD to play until after the suppression hearing.  This Court takes counsel's assertion as bona fide offers of proof, and nothing of record hints otherwise.   Moreover, the Commonwealth has contested defense counsel's assertion that the CD would not play for him prior to or during the suppression hearing.

Thus, we conclude that, while Williams' attorney may have had a physical copy of the Commonwealth's CD in his possession, the fact that he was unable to view its content rendered that content "unavailable" and "undiscoverable" to him for purposes of Pa.R.Crim.P. 581(J).  As such, we

conclude that Judge Todd should have, as a matter of law, granted Williams' motion to reopen the suppression court record and admitted the video under Rule 581(J)'s exception. We therefore agree with Judges Todd and Ignelzi that Judge Todd "erred in not reopening the record, admitting, and reviewing the shooting video . . ." Trial Court Opinion, 8/9/17, at 29.

At the heart of Williams' four motions regarding the inoperable CD was his premise that a fact finder needs to examine the testimony of the police officers, juxtaposed against the objective evidence of the video. In his view, the policemen's subjective recollections of what the video portrayed pale in comparison to the "Best Evidence" of the recording itself.[5] We agree.

Therefore, we now remand this case:

> to the court below with directions that it conduct a new suppression hearing. If, after a new hearing, it determines that the evidence concerned should not be suppressed, then the judgment of sentence shall stand affirmed. If, on the other hand, it determines that the evidence concerned or a part of it shall be suppressed, then the judgment of sentence shall be vacated and a new trial be granted.

Commonwealth v. Ryan, 419 A.2d 762, 763 (Pa. Super. 1980).

"Because of our disposition of this case, we do not decide the remaining issues" that Williams has raised in this appeal, but, if "there is

---

[5] The "Best Evidence Rule" provides that the "original writing, recording, or photograph is required in order to prove its content . . . ." Pennsylvania Rule of Evidence 1002.

another appeal in this case, [his] remaining issues may again be raised" at that time.  Commonwealth v. Berkheimer, 460 A.2d 233, 236 (Pa. 1983).

Orders denying motions to reopen suppression record reversed; case remanded with instructions; jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/28/2018