J-S61034-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
:                   PENNSYLVANIA
:
v.                                      :
:
:
:
RAHNIR CLARK                            :
:
Appellant              :    No. 374 EDA 2019

Appeal from the Judgment of Sentence Entered January 16, 2019
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0002094-2018

BEFORE:   BOWES, J., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED JANUARY 16, 2020**

Appellant, Rahnir Clark, appeals from the judgment of sentence entered
in the Court of Common Pleas of Delaware County.  The court, sitting as finder
of fact in Appellant's and Co-Defendant's joint trial, acquitted Co-Defendant
but found Appellant guilty of one count of Possession with Intent to Deliver
("PWID"), two counts of Possession of a Controlled Substance, and one count
of Use/Possession of Drug Paraphernalia.[1]

Sentenced to five to 10 years' incarceration for the PWID conviction,
with concurrent sentences on the remaining charges, Appellant filed a timely
notice of direct appeal and a court-ordered Pa.R.A.P. 1925(b) statement in
which he challenged the denial of his pre-trial motion to suppress and asserted

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 35 Pa.C.S.A. §§ 780-113(a)(30), (16), and (32), respectively.

sentencing counsel harbored a conflict of interest by having served as Co-Defendant's counsel during trial.  We affirm.

The relevant facts for purposes of reviewing the present appeal are set forth in the trial court's "Findings of Fact" made from evidence adduced at Appellant's suppression hearing:

1. Sergeant Matthew P. Goldschmidt is employed by the City of Chester Police Department since January of 2007.  For approximately eight years of his career he was assigned to the Chester Police Department Narcotics Unit and the Delaware County Drug Task Force.  N.T. Suppression, 8/16/2018, p. 7, 8.

2. During his career, he has been involved in well over 1,000 drug investigations.  The majority of those investigations involved cocaine.  Having worked in the City of Chester for over ten years, Sergeant Goldschmidt is familiar with the various neighborhoods in the City of Chester and the crime statistics in those neighborhoods.  N.T. at 9.

3. Sergeant Goldschmidt knows the Sun Village area of Chester as a high crime and a high drug area.  The police respond there almost daily to investigate violent and/or drug crimes.  N.T. at 10.

4. Sergeant Goldschmidt has specialized training in the area of drug investigations and has been qualified as an expert witness in that regard in the Delaware County Court of Common Pleas and District Courts.  N.T. at 10, 11.

5. On January 18, 2018, he was on duty in his capacity as a Sergeant with the City of Chester Police Department in full uniform and in a marked police cruiser during the three in the afternoon until 11 p.m. at night shift.  N.T. at 11.

6. At approximately 7:22 that evening, Sergeant Goldschmidt was in the Sun Village area of Chester in the parking lot of a

carwash located at Morton Avenue and Sun Drive when he observed a red Chrysler 200 with dark tinted windows. He exited the parking lot and followed behind the red Chrysler. N.T. at 13.

7. As Sergeant Goldschmidt followed the Chrysler he observed that the operator failed to use a turn signal while making a left-hand turn from Vauclain onto Remington Street and then again from Remington into a parking lot. After witnessing these Motor Vehicle Code violations, Sergeant Goldschmidt activated his emergency lights to make a traffic stop on said vehicle. N.T. at 14.

8. When Sergeant Goldschmidt approached the driver's side of the vehicle he observed that Defendant [hereinafter Co-Defendant], Raneisha Little, was the operator and Defendant [hereinafter "Appellant"], Rahnir Clark, was the front passenger of the vehicle. At that time, Officer Breyhew [Abreu] and Officer Murphy arrived as backup. N.T. at 16.

9. Sergeant Goldschmidt asked to see the vehicle registration and insurance information and some type of identification from the occupants. Sergeant Goldschmidt noticed the occupants were extremely nervous and sweating heavily although it was 25 degrees outside. They gave conflicting stories as to why they were there; they answered the officer's questions with questions, there were no businesses open at that time of the night and their story failed to check out. N.T. at 17, 18, 49.

10. As Sergeant Goldschmidt spoke with Co-Defendant Little, Officer Abreu requested Appellant exit the vehicle for Officers[’] safety. Officer Abreu frisked Appellant for weapons, however, Appellant prevented Officer Abreu from frisking his waist and groin area. N.T. at 21.

11. Appellant's lack of cooperation raised Sergeant Goldschmidt's suspicions. His experience in Chester clearly communicates to him that when a person will not cooperate when an officer is trying to frisk them, generally they are hiding something. Usually around the waist, [an officer] will find a weapon. This raises concern for officer safety. N.T. at 22.

12.    As Sergeant Goldschmidt looked into the vehicle, he heard and observed a black BaoFeng police scanner attached to the passenger side front sun visor.  He noticed that when he was speaking on his radio he could hear himself within the vehicle.  This led Sergeant Goldschmidt to conclude the scanner was programmed to the police frequency for the City of Chester [where] they were located.  N.T. at 23.

13.    Shortly thereafter Appellant was brought to the rear of the vehicle and placed into handcuffs for officer safety until their investigation was completed.  N.T. at 24.

14.    Sergeant Goldschmidt then asked Co-Defendant Little if anything illegal was in the car.  Co-Defendant Little stated she had a hand gun in her purse and that she had a valid permit to carry that firearm.  N.T. at 25.

15.    Sergeant Goldschmidt asked Co-Defendant Little for consent to search the car.  She orally agreed.  Sergeant Goldschmidt then read her the ***Miranda*** warnings and asked her to complete a Chester Police Department Consent to Search Vehicle form.  Co-Defendant Little signed the form. N.T. at 25-29.

16.    Sergeant Goldschmidt recovered from the vehicle baggies with cocaine and marijuana residue and items of drug paraphernalia.   Both [Co-Defendant and Appellant] were placed under arrest.  At this time Sergeant Goldschmidt read Appellant the ***Miranda*** warnings.

17.    Officer Abreu and Sergeant Goldschmidt frisked Appellant again and felt a large, hard bulge underneath his groin.  Sergeant Goldschmidt asked Appellant what the bulge was.  Appellant responded it was four ounces of cocaine.  Officer Abrue then went down his pants in Sergeant Goldschmidt's presence and removed the drugs.  N.T. at 32, 33.

Trial Court Order Denying Appellant's Motion to Suppress, 9/25/18, at 5.

In Appellant's first issue, he argues that evidence adduced at his suppression hearing failed to demonstrate reasonable suspicion necessary to order Appellant out of the vehicle and perform a weapons frisk on him. In an appeal from the denial of a motion to suppress,

> [our] standard of review ... is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010). Further, "the record" refers to "the evidentiary record that was created at the suppression hearing." *Commonwealth v. Cruz*, 166 A.3d 1249, 1254 (Pa.Super. 2017); *In re L.J.*, 79 A.3d 1073 (Pa. 2013).

There is no reasonable dispute that the officers possessed probable cause to initiate the traffic stop after witnessing Co-Defendant commit a motor vehicle code violation. The issue before us as articulated by Appellant on appeal is whether, during the lawful investigation stemming from the code

violation, the officers formed a reasonable suspicion of criminality to support a weapons frisk that uncovered cocaine in Appellant's possession.

As we have explained, "[t]he Fourth Amendment to the [United States] Constitution and Article I, Section 8 of [the Pennsylvania] Constitution protect citizens from unreasonable searches and seizures. To safeguard this right, courts require police to articulate the basis for their interaction with citizens in [three] increasingly intrusive situations." **Commonwealth v. McAdoo**, 46 A.3d 781, 784 (Pa.Super. 2012). Our Supreme Court has categorized these three situations as follows:

> The first category, a mere encounter or request for information, does not need to be supported by any level of suspicion, and does not carry any official compulsion to stop or respond. The second category, an investigative detention, derives from **Terry v. Ohio**[, 392 U.S. 1 (1968)] and its progeny: such a detention is lawful if supported by reasonable suspicion because, although it subjects a suspect to a stop and a period of detention, it does not involve such coercive conditions as to constitute the functional equivalent of an arrest. The final category, the arrest or custodial detention, must be supported by probable cause.

**Commonwealth v. Smith**, 836 A.2d 5, 10 (Pa. 2003).

After identifying the instant matter as one involving a second category interaction, namely, an investigative detention, the suppression court determined the totality of circumstances known to the sergeant and officer during the lawful traffic stop supplied reasonable suspicion to support a weapons frisk of Appellant and Co-Defendant for officers' safety. We agree.

In **Commonwealth v. Simmons**, 17 A.3d 399 (Pa.Super. 2011), this Court stated:

> [An officer]'s observation of furtive movements, within the scope of a lawful stop, led him to reasonably be concerned for his safety and therefore justified the **Terry**[] protective frisk. Indeed, on multiple occasions we have held that similar furtive movements, when witnessed within the scope of a lawful traffic stop, provided a reasonable basis for a protective frisk.

*Id.*, at 404 (citations omitted); *see also in re O.J.*, 958 A.2d 561, 566 (stating defendant's "rapid and furtive hand movements over the console indicated that he may have been hiding a weapon in that location[;]" "the police officer was permitted to engage in a search of that compartment for his own protection[;]" "constitutional safeguards do not require an officer to gamble with his life[.]").

Nevertheless, this Court has explained:

> [P]re-stop furtive movements, by themselves, may not be used to justify an investigative detention and search commenced after the conclusion of a valid traffic stop where the totality of circumstances has established that the furtive movements did not raise immediate concern for the safety of the officer who undertook the initial vehicle detention.

*Simmons*, 17 A.3d at 405; *see also Commonwealth v. Moyer*, 954 A.2d 659, 670 (Pa.Super. 2008) (*en banc*) (stating "[f]urtive movements and nervousness, standing alone, do not support the existence of reasonable suspicion). Accordingly, the Commonwealth must both show the police saw furtive movements during the stop and that there were additional reasons for them to be concerned about the presence of weapons in order to demonstrate reasonable suspicion. *See Commonwealth v. Buchert*, 68 A.3d 911, 916-17 (Pa. Super. 2013).

At Appellant's suppression hearing, the Commonwealth established through the testimony of Sergeant Goldschmidt that the traffic stop took place at nighttime in a high-crime, high-drug trafficking location. Upon encountering Appellant and Co-Defendant, the sergeant observed them to appear extremely nervous and oddly sweaty despite the cold temperature outside.[2] When the sergeant asked why they pulled into the commercial parking lot after hours, Appellant and Co-Defendant said they were leaving the car for service—repair of a bullet hole and replacement of brakes—that the business in question did not provide.

Appellant and Co-Defendant persisted in their evasive and uncooperative behavior by continually providing unresponsive answers or answering the sergeant's questions with questions of their own. They particularly raised the officers' concerns, however, by refusing repeated requests to cooperate by keeping their hands up in plain view: "[Appellant] continually kept putting his hands down where . . . [the officers] could not see them . . . ." N.T. at 46; "[Appellant's] hands . . . would go right back down again after a couple of seconds." N.T. at 61.

Accordingly, Officer Abreu ordered Appellant out of the car for a weapons frisk. When Appellant guarded against a frisk of his front waistband

---

[2] In both his cross-examination of the sergeant and his appellate brief, Appellant notes that the record failed to rule out the possibility that the temperature inside the vehicle was very warm. Pertinent to the suppression court's assessment of the totality of circumstances confronting the officers, however, was that it is highly unusual for car passengers to sweat profusely, particularly for no apparent reason.

and groin—a common spot for concealment of a gun—it raised Sergeant Goldschmidt's suspicion of a weapon, and Appellant was handcuffed. At the same time, Sergeant Goldschmidt noticed that a portable police scanner on the passenger-side visor was tuned into the Chester Police Station frequency and was playing the sergeant's radio messages as he gave them. A second attempt to frisk Appellant detected a hard bulge below the waistband, which Appellant acknowledged was a bag of cocaine.

This combination of erratic, furtive, and noncompliant behavior occurring during a lawful,[3] nighttime stop in a high crime/drug crime area provided a reasonable basis for concerns about officer safety justifying a weapons search of Appellant. *See Buchert*, 68 A.3d at 916-17 (holding frisk supported by reasonable suspicion where passenger made furtive movements and defendant behaved in nervous manner during nighttime traffic stop). The record, therefore, supports the order denying Appellant's motion to suppress.

In Appellant's second issue, he demands a new trial because defense counsel who represented him at sentencing failed to offer a colloquy disclosing the potential for conflict arising from counsel's having represented Co-Defendant at trial. Appellant concedes he raised no *pro se* objection to dual representation at his sentencing, but he contends waiver may not apply in the

---

[3] There is no dispute that at the time of the weapons frisk uncovering the contraband in question, the lawful traffic stop for Co-Defendant's motor vehicle code violation was still in progress.

absence of disclosure of potential conflict and the opportunity to waive expressly his rights to exclusive counsel.

Decisional law pertaining to dual representation and conflict of interest is well-established:

> [D]ual representation is insufficient to support a finding of conflict of interest, and is not a *per se* violation of constitutional guarantees of effective assistance of counsel. To make the dual representation rise to a true conflict, appellant need not show that actual harm resulted, but must at least show the possibility of harm. The law applicable to dual representation cases was delineated in **Commonwealth v. Breaker**, 456 Pa. 341, 344–45, 318 A.2d 354, 356 (1974):
>
>> "Our dual representation cases make several principles clear. First, '[i]f, in the representation of more than one defendant, a conflict of interest arises, the mere existence of such conflict vitiates the proceedings, even though no *actual* harm results. The potentiality that such harm *may* result, furnishes the appropriate criterion.' **Commonwealth ex rel. Whitling v. Russell**, 406 Pa. 45, 48, 176 A.2d 641, 643 (1962). Second, a defendant must demonstrate that a conflict of interest actually existed at trial, because 'dual representation alone does *not* amount to a conflict of interest.' **Commonwealth v. Wilson,** 429 Pa. 458, 463, 240 A.2d 498, 501 (1968); **Commonwealth ex rel. Corbin v. Myers**, 419 Pa. 139, 213 A.2d 356 (1965), *cert. denied,* 386 U.S. 1013, 87 S.Ct. 1361, 18 L.Ed.2d 445 (1967). Third, '[t]o make the dual representation rise to a true conflict, appellant need not show that actual harm resulted, ... but he must at least show the possibility of harm....' **Commonwealth v. Wilson**, *supra* [429 Pa.] at 463, 240 A.2d at 501. Fourth, appellant will satisfy the requirement of demonstrating possible harm, if he can show, *inter alia*, 'that he had a defense inconsistent with that advanced by the other client, or that counsel neglected his case in order to give the other client a more spirited defense.' ***Id. Accord***,

> ***Commonwealth v. Cox***, 441 Pa. 64, 69, 270 A. 2d
> 207, 209 (1970) (plurality opinion)."

> ***Commonwealth v. Evans***, 306 Pa.Super. 25, 451 A.2d 1373,
> 1374–1375 (1982).

***Commonwealth v. Rogal***, 120 A.3d 994, 1005-1006 (Pa.Super. 2015) (addressing claim on direct review and dismissing it on the merits). ***See also Commonwealth v. Collins***, 957 A.2d 237, 251 (Pa. 2008) ("To show an actual conflict of interest, the appellant must demonstrate that: (1) counsel "actively represented conflicting interests"; and (2) those conflicting interests "adversely affected his lawyer's performance.").

Assuming, *arguendo*, this claim is ripe for direct review, we conclude Appellant's argument fails because it offers merely a bare assertion that dual representation at sentencing carried the potential for conflict. Critically, he makes no attempt to show, as decisional law requires, an actual conflict of interest that adversely affected his lawyer's performance. Because Appellant makes no such demonstration, he may not prevail on this claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>1/16/20</u>